Justice Kennedy
delivered the opinion of the Court.
The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures. A search may be of a person, a thing, or a place. So too a seizure may be of a person, a thing, or even a place. A search or a seizure may occur singly or in combination, and in differing sequence. In some cases the validity of one determines the validity of the other. The instant case involves the search of a place (an apartment dwelling) and the seizure of a person. But here, though it is acknowledged that the search was lawful,.it does not follow that the seizure was lawful as well. The seizure of the person is quite in question. The issue to be resolved is whether the seizure of the person was reasonable when he was stopped and detained at some distance away from the premises to be searched when the only justification for *190 the detention was to ensure the safety and efficacy of the search.
I
A
At 8:45 p.m. on July 28, 2005, local police obtained a warrant to search a residence for a .380-caliber handgun. The residence was a basement apartment at 103 Lake Drive, in Wyandanch, New York. A confidential informant had told police he observed the gun when he was at the apartment to purchase drugs from “a heavy set black male with short hair” known as “Polo.” App. 16-26. As the search unit began preparations for executing the warrant, two officers, Detectives Richard Sneider and Richard Gorbecki, were conducting surveillance in an unmarked car outside the residence. About 9:56 p.m., Sneider and Gorbecki observed two men—later identified as petitioner Chunon Bailey and Bryant Middleton—leave the gated area above the basement apartment and enter a car parked in the driveway. Both matched the general physical description of “Polo” provided by the informant. There was no indication that the men were aware of the officers’ presence or had any knowledge of the impending search. The detectives watched the car leave the driveway. They waited for it to go a few hundred yards down the street and followed. The detectives informed the search team of their intent to follow and detain the departing occupants. The search team then executed the search warrant at the apartment.
Detectives Sneider and Gorbecki tailed Bailey’s car for about a mile—and for about five minutes—before pulling the vehicle over in a parking lot by a fire station. They ordered Bailey and Middleton out of the car and did a patdown search of both men. The officers found no weapons but discovered a ring of keys in Bailey’s pocket. Bailey identified himself and said he was coming from his home at 103 Lake Drive. His driver’s license, however, showed his address as Bay- *191 shore, New York, the town where the confidential informant told the police the suspect, “Polo,” used to live. Id., at 89. Bailey’s passenger, Middleton, said Bailey was giving him a ride home and confirmed they were coming from Bailey’s residence at 103 Lake Drive. The officers put both men in handcuffs. When Bailey asked why, Gorbecki stated that they were being detained incident to the execution of a search warrant at 103 Lake Drive. Bailey responded: “I don’t live there. Anything you find there ain’t mine, and I’m not cooperating with your investigation.” Id., at 57, 77.
The detectives called for a patrol cár to take Bailey and Middleton back’ to the Lake Drive apartment. Detective Sneider drove the unmarked car back, while Detective Gor-becki used Bailey’s set of keys to drive Bailey’s car back to the search scene. By the time the group returned to 103 Lake Drive, the search team had discovered a gun and drugs in plain view inside the apartment. Bailey and Middleton were placed under arrest, and Bailey’s keys were seized incident to the arrest. Officers later discovered that one of Bailey’s keys opened the door of the basement apartment.
B
Bailey was charged with three federal offenses: possession of cocaine with intent to distribute, in violation of 21 U. S. C. §§ 841(a)(1) and (b)(1)(B)(iii); possession of a firearm by a felon, in violation of 18 U. S. C. § 922(g)(1); and possession of a firearm in furtherance of a drug-trafficking offense, in violation of § 924(c)(1)(A)(i). At trial Bailey moved to suppress the apartment key and the statements he made when stopped by Detectives Sneider and Gorbecki. That evidence, Bailey argued, derived from an unreasonable seizure. After an evidentiary hearing the United States District Court for the Eastern District of New York denied the motion to suppress. The District Court held that Bailey’s detention was permissible under Michigan v. Summers, 452 U. S. 692 (1981), as a detention incident to the execution of *192 a search warrant. In the alternative, it held that Bailey’s detention was lawful as an investigatory detention supported by reasonable suspicion under Terry v. Ohio, 392 U. S. 1 (1968). After a trial the jury found Bailey guilty on all three counts.
The Court of Appeals for the Second Circuit ruled that Bailey’s detention was proper and affirmed denial of the suppression motion. It interpreted this Court’s decision in Summers to “authoriz[e] law enforcement to detain the occupant of premises subject to a valid search warrant when that person is seen leaving those premises and the detention is effected as soon as reasonably practicable.” 652 F. 3d 197, 208 (2011). Having found Bailey’s detention justified under Summers, the Court of Appeals did not address the District Court’s alternative holding that the stop was permitted under Terry.
The Federal Courts of Appeals have reached differing conclusions as to whether Michigan v. Summers justifies the detention of occupants beyond the immediate vicinity of the premises covered by a search warrant. This Court granted certiorari to address the question. 566 U. S. 1033 (2012).
H—i
The Fourth Amendment, applicable through the- Four- ' teenth Amendment to the States, provides: “The right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . particularly describing the place to be searched, and the persons or things to be seized.” This Court has stated “the general rule that Fourth Amendment seizures are ‘reasonable’ only if based on probable cause” to believe that the individual has committed a crime. Dunaway v. New York, 442 U. S. 200, 213 (1979). The standard of probable cause, with “roots that are deep in our history,” Henry v. United States, 361 U. S. 98, 100 (1959), “represent[s] the accumulated wisdom of precedent and ex *193 perience as to the minimum justification necessary to make the kind of intrusion involved in an arrest ‘reasonable’ under the Fourth Amendment.” Dunaway, supra, at 208.
Within the framework of these fundamental rules there is some latitude for police to detain where “the intrusion on the citizen’s privacy ‘was so much less severe’ than that involved in a traditional arrest that ‘the opposing interests in crime prevention and detection and in the police officer’s safety’ could support the seizure as reasonable.” Summers, supra, at 697-698 (quoting Dunaway, supra, at 209); see also Terry, supra, at 27 (holding that a police officer who has reasonable suspicion of criminal activity may conduct a brief investigative stop).
In Summers, the Court defined an important category of cases in which detention is allowed without probable cause to arrest for a crime. It permitted officers executing a search warrant “to detain the occupants of the premises while a proper search is conducted.” 452 U. S., at 705. The rule in Summers extends further than some earlier exceptions because it does not require law enforcement to have particular suspicion that an individual is involved in criminal activity or poses a specific danger to the officers. Muehler v. Mena, 544 U. S. 93 (2005). In Muehler, applying the rule in Summers, the Court stated: “An officer’s authority to detain incident to a search is categorical; it does not depend on the ‘quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.’ ” 544 U. S., at 98 (quoting Summers, supra, at 705, n. 19). The rule, announced in Summers allows detention incident to the execution of a search warrant “because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial.” Muehler, supra, at 98.
In Summers and later cases, the occupants detained were found within or immediately outside a residence at the moment the police officers executed the search warrant. In *194 Summers, the defendant was detained on a walk leading down from the front steps of the house. See Tr. of Oral Arg. in O. T. 1980, No. 79-1794, pp. 41-42; see also Muehler, supra, at 96 (detention of occupant in adjoining garage); Los Angeles County v. Rettele, 550 U. S. 609, 611 (2007) (per curiam) (detention of occupants in bedroom). Here, however, petitioner left the apartment before the search began; and the police officers waited to detain him until he was almost a mile away. The issue is whether the reasoning in Summers can justify detentions beyond the immediate vicinity of the premises being searched. An exception to the Fourth Amendment rule prohibiting detention absent probable cause must not diverge from its purpose and rationale. See Florida v. Royer, 460 U. S. 491, 500 (1983) (plurality opinion) (“The scope of the detention must be carefully tailored to its underlying justification”)- It is necessary, then, to discuss the reasons for the rule explained in Summers to determine if its rationale extends to a detention like the one here.
A
In Summers, the Court recognized three important law enforcement interests that, taken together, justify the detention of an occupant who is on the premises during the execution of a search warrant: officer safety, facilitating the completion of the search, and preventing flight. 452 U. S., at 702-703.
1
The first interest identified in Summers was “the interest in minimizing the risk of harm to the officers.” Id., at 702. There the Court held that “the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence,” and “[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.” Id., at 702-703.
*195 When law enforcement officers execute a search warrant, safety considerations require that they secure the premises, which may include detaining current occupants. By taking “unquestioned command of. the situation,” id., at 703, the officers can search without fear that occupants, who are on the premises and able to observe the course of the search, will become disruptive, dangerous, or otherwise frustrate the search.
After Summers, this Court decided Muehler v. Mena. The reasoning and conclusions in Muehler in applying the Summers rule go quite far in allowing seizure and detention of persons to accommodate the necessities of a search. There, the person detained and held in handcuffs was not suspected of the criminal activity being investigated; but, the Court held, she could be detained nonetheless, to secure the premises while the search was underway. The “safety risk inherent in executing a search warrant for weapons was sufficient to justify the use of handcuffs, [and] the need to detain multiple occupants made the use of handcuffs all the more reasonable.” 544 U. S., at 100. While the Court in Muehler did remand for consideration of whether the detention there—alleged to have been two or three hours—was necessary in light of all the circumstances, the fact that so prolonged a detention indeed might have been permitted illustrates the far-reaching authority the police have when the detention is made at the scene of the search. This in turn counsels caution before extending the power to detain persons stopped or apprehended away from the premises where the search is being conducted.
It is likely, indeed almost inevitable in the case of a resident, that an occupant will return to the premises at some point; and this might occur when the officers are still conducting the search. Officers can and do mitigate that risk, however, by taking routine precautions, for instance by erecting barricades or posting someone on the perimeter or at the door. In the instant case Bailey had left the premises, *196 apparently without knowledge of the search. He posed little risk to the officers at the scene. If Bailey had rushed back to his apartment, the police could have apprehended and detained him under Summers. There is no established principle, however, that allows the arrest of anyone away from the premises who is likely to return.
The risk, furthermore, that someone could return home during the execution of a search warrant is not limited to occupants who depart shortly before the start of a search. The risk that a resident might return home, either for reasons unrelated to the search or after being alerted by someone at the scene, exists whether he left five minutes or five hours earlier. Unexpected arrivals by occupants or other persons accustomed to visiting the premises might occur in many instances. Were police to have the authority to detain those persons away from the premises, the authority to detain incident to the execution of a search warrant would reach beyond the rationale of ensuring the integrity of the search by detaining those who are in fact on the scene.
The Court of Appeals relied on an additional safety consideration. It concluded that limiting the application of the authority to detain to the immediate vicinity would put law enforcement officers in a dilemma. They would have to choose between detaining an individual immediately (and risk alerting occupants still inside) or allowing the individual to leave (and risk not being able to arrest him later if incriminating evidence were discovered). 652 F. 3d, at 205-206. Although the danger of alerting occupants who remain inside may be of real concern in some instances, as in the case when a no-knock warrant has been issued, this safety rationale rests on the false premise that a detention must take place. If the officers find that it would be dangerous to detain a departing individual in front of a residence, they are not required to stop him. And, where there are grounds to believe the departing occupant is dangerous, or involved in criminal activity, police will generally not need Summers to *197 detain him at least for brief questioning, as they can rely instead on Terry.
The risk that a departing occupant might notice the police surveillance and alert others still inside the residence is also an insufficient safety rationale to justify expanding the existing categorical authority to detain so that it extends beyond the immediate vicinity of the premises to be searched. If extended in this way the rationale would justify detaining anyone in the neighborhood who could alert occupants that the police are outside, all without individualized suspicion of criminal activity or connection to the residence to be •searched. This possibility demonstrates why it is necessary to confine the Summers rule to those who are present when and where the search is being conducted.
2
The second law enforcement interest relied on in Summers was that “the orderly completion of the search may be facilitated if the occupants of the premises are present.” 452 U. S., at 703. This interest in efficiency derives from distinct, but related, concerns.
If occupants are permitted to wander around the premises, there is the potential for interference with the execution of the search warrant. They can hide or destroy evidence, seek to distract the officers, or simply get'in the way. Those risks are not presented by an occupant who departs beforehand. So, in this case, after Bailey drove away from the Lake Drive apartment, he was not a threat to the proper execution of the search. Had he returned, officers would have been free to detain him at that point. A general interest in avoiding obstruction of a search, however, cannot justify detention beyond the vicinity of the premises to be searched.
Summers also noted that occupants can assist the officers. Under the reasoning in Summers, the occupants’ “self-interest may induce them to open locked doors or locked con *198 tainers to avoid the use of force that is not only damaging to property but may also delay the completion of the task at hand.” Ibid. This justification must be confined to those persons who are on site and so in a position, when detained, to at once observe the progression of the search; and it would have no limiting principle were it to be applied to persons beyond the premises of the search. Here, it appears the police officers decided to wait until Bailey had left the vicinity of the search before detaining him. In any event it later became clear to the officers that Bailey did not wish to cooperate. See App. 57, 77 (“I don’t live there. Anything you find there ain’t mine, and I’m not cooperating with your investigation”). And, by the time the officers brought Bailey back to the apartment, the search team had discovered contraband. Bailey’s detention thus served no purpose in ensuring the efficient completion of the search.
a
The third law enforcement interest addressed in Summers was the “the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found.” 452 U. S., at 702. The proper interpretation of this language, in the context of Summers and in the broader context of the reasonableness standard that must govern and inform the detention incident to a search, is that the police can prohibit an occupant from leaving the scene of the search. As with the other interests identified in Summers, this justification serves to preserve the integrity of the search by controlling those persons who are on the scene. If police officers are concerned about flight, and have to keep close supervision of occupants who are not restrained, they might rush the search, causing unnecessary damage to property or compromising its careful execution. Allowing officers to secure the scene by detaining those present also prevents the search from being impeded by occupants leaving with the evidence being sought or the means to find it.
*199 The concern over flight is not because of the danger of flight itself but because of the damage that potential flight can cause to the integrity of the search. This interest does not independently justify detention of an occupant beyond the immediate vicinity of the premises to be searched. The need to prevent flight, if unbounded, might be used to argue for detention, while a search is underway, of any regular occupant regardless of his or her location at the time of the search. If not circumscribed, the rationale of preventing flight would justify, for instance, detaining a suspect who is 10 miles away, ready to board a plane. The interest in preventing escape from police cannot extend this far without undermining the usual rules for arrest based on probable cause or a brief stop for questioning under standards derived from Terry. Even if the detention of a former occupant away from the premises could facilitate a later arrest should incriminating evidence be discovered, “the mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment.” Mincey v. Arizona, 437 U. S. 385, 393 (1978).
In sum, of the three law enforcement interests identified to justify the detention in Summers, none applies with the same or similar force to the detention of recent occupants beyond the immediate vicinity of the premises to be searched. Any of the individual interests is also insufficient, on its own, to justify an expansion of the rule in Summers to permit the detention of a former occupant, wherever he may be found away from the scene of the search. This would give officers too much discretion. The categorical authority to detain incident to the execution of a search warrant must be limited to the immediate vicinity of the premises to be searched.
B
In Summers, the Court recognized the authority to detain occupants incident to the execution of a search warrant not only in light of the law enforcement interests at stake but *200 also because the intrusion on personal liberty was limited. The Court held detention of a current occupant “represents only an incremental intrusion on personal liberty when the search of a home has been authorized by a valid warrant.” 452 U. S., at 703. Because the detention occurs in the individual’s own home, “it could add only minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station.” Id., at 702.
Where officers arrest an individual away from his home, however, there is an additional level of intrusiveness. A public detention, even if merely incident to a search, will resemble a full-fledged arrest. As demonstrated here, detention beyond the immediate vicinity can involve an initial detention away from the scene and a second detention at the residence. In between, the individual will suffer the additional indignity of a compelled transfer back to the premises, giving all the appearances of an arrest. The detention here was more intrusive than a usual detention at the search scene. Bailey’s car was stopped; he was ordered to step out and was detained in full public view; he was handcuffed, transported in a marked patrol car, and detained further outside the apartment. These facts illustrate that detention away from a premises where police are already present often will be more intrusive than detentions at the scene.
C
Summers recognized that a rule permitting the detention of occupants on the premises during the execution of a search warrant, even absent individualized suspicion, was reasonable and necessary in light of the law enforcement interests in conducting a safe and efficient search. Because this exception grants substantial authority to police officers to detain outside of the traditional rules of the Fourth Amendment, it must be circumscribed.
*201 A spatial constraint defined by the immediate vicinity of the premises to be searched is therefore required for detentions incident to the execution of a séarch warrant. The police action permitted here—the .search of a residence—has a spatial dimension, and so a spatial or geographical boundary can be used to determine the area within which both the search and detention incident to that search may occur. Limiting the rule in Summers to the area in which an occupant poses a real threat to the safe and efficient execution of a search warrant ensures that the scope of the detention incident to a search is confined to its underlying justification. Once an occupant is beyond the immediate vicinity of the premises to be searched, the search-related law enforcement interests are diminished and the. intrusiveness of the detention is more severe.
Here, petitioner was detained at a point beyond any reasonable understanding of the immediate vicinity of the premises in question; and so this case presents neither the necessity nor the occasion to further define the meaning of immediate vicinity. In closer cases courts can consider a number of factors to determine whether an occupant was detained within the immediate vicinity of the premises to be searched, including the lawful limits of the premises, whether the occupant was within the line of sight of his dwelling, the ease of reentry from the occupant’s location, and other relevant factors.
Confining an officer’s authority to detain under Summers to the immediate vicinity of a premises to be searched is a proper limit because it accords with the rationale of the rule. The rule adopted by the Court of Appeals here, allowing detentions of a departed occupant “as soon as reasonably practicable,” departs from the spatial limit that is necessary to confine the rule in light of the substantial intrusions on the liberty of those detained. Because detention is justified by the interests in executing a safe and efficient search, the decision to detain must be acted upon at the scene of the *202 search and not at a later time in a more remote place. If officers elect to defer the detention until the suspect or departing occupant leaves the immediate vicinity, the lawfulness of detention is controlled by other standards, including, of course, a brief stop for questioning based on reasonable suspicion under Terry or an arrest based on probable cause. A suspect’s particular actions in leaving the scene, including whether he appears to be armed or fleeing with the evidence sought, and any information the officers acquire from those who are conducting the search, including information that incriminating evidence has been discovered, will bear, of course, on the lawfulness of a later stop or detention. For example, had the search team radioed Detectives Sneider and Gorbecki about the gun and drugs discovered in the Lake Drive apartment as the officers stopped Bailey and Middleton, this may have provided them with probable cause for an arrest.
Ill
Detentions incident to the execution of a search warrant are reasonable under the Fourth Amendment because the limited intrusion on personal liberty is outweighed by the special law enforcement interests at stake. Once an individual has left the immediate vicinity of a premises to be searched, however, detentions must be justified by some other rationale. In this respect it must be noted that the District Court, as an alternative ruling, held that stopping petitioner was lawful under Terry. This opinion expresses no view on that issue. It will be open, on remand, for the Court of Appeals to address the matter and to determine whether, assuming the Terry stop was valid, it yielded information that justified the detention the officers then imposed.
The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.