# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-2321
_____

United States of America

*Plaintiff - Appellee*

v.

Lawrence Johnson, also known as Darrell Johnson

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa, Waterloo

_____

Submitted: January 18, 2013
Filed: June 13, 2013

_____

Before WOLLMAN, GRUENDER, and SHEPHERD, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

A jury convicted Lawrence Johnson of one count of conspiracy to distribute and possess with the intent to distribute 1 kilogram or more of a mixture or substance containing a detectable amount of heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846, and 851 (count 1); two counts of possession with intent to distribute a mixture or substance containing a detectable amount of heroin in violation

of §§ 841(a)(1), 841(b)(1)(C), and 851 (counts 11 and 14); one count of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c) (count 21); and one count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (count 22). The district court[1] sentenced Johnson to the statutory mandatory term of life imprisonment on count 1; 360 months' imprisonment on counts 11 and 14; 60 months' imprisonment on count 21; and 120 months' imprisonment on count 22, with the sentences on counts 1, 11, 14, and 22 to be served concurrently and the sentence on count 21 to be served consecutively to the terms of all other counts. Johnson appeals his conviction, the denial of his motion for new trial, and his sentence. We affirm.

I.

Dwayne Appling was the primary source of heroin in Waterloo, Iowa, in 2008. After a search warrant was executed at Appling's home, he fled town, thereby creating a decentralized heroin network in Waterloo. Without a primary source for heroin, Waterloo became a cooperative market for the remaining dealers. The dealers not only began supplying one another, but also "fronted," or advanced, heroin to one another and referred customers back and forth depending upon the availability of heroin in the city.

The evidence at trial showed that Johnson was one such dealer and that he sold heroin in quantities for personal use as well as for resale. Johnson fronted other dealers in Waterloo with heroin, including Rochester Mitchell and Johnson's own mother, Catherine Johnson (Catherine). In turn, Mitchell, Catherine, and others would "steer," or direct, heroin customers to Johnson from time to time. One such transaction took place on January 12, 2011, when Lucious Simmons, working as a

---

[1]The Honorable Linda R. Reade, Chief Judge, United States District Judge for the Northern District of Iowa.

criminal informant, attempted to purchase heroin from Jonathan Virgil. Virgil informed Simmons that he did not currently have any heroin to sell but that he could arrange for Johnson to sell some to Simmons. Simmons picked up Virgil and drove to a residence on Cutler Street in Waterloo, where Johnson exited the residence and entered Simmons's vehicle. After a brief discussion, Simmons purchased ten bags of heroin weighing 2.1 grams in total from Johnson for $200. Johnson then gave Virgil two free bags of heroin for steering Simmons to him. Subsequent testing of the drugs purchased by Simmons demonstrated that they contained a mixture that was 3% pure heroin.

On February 15, 2011, law enforcement officers executed a search warrant at the Cutler Street residence. They seized seven bags of heroin, which contained 0.96 grams in total of a mixture containing 0.88% pure heroin. Along with the heroin, a loaded 9 mm handgun was seized. Johnson claimed ownership of both the heroin and the handgun during the search.

At trial, the government presented evidence regarding the cooperative heroin network in Waterloo. Several individuals testified that they met Johnson while purchasing heroin from his mother, Catherine, and then eventually began purchasing heroin from Johnson as well. Simmons and others testified regarding the various times they had purchased heroin from Johnson and identified whether the purchase was in an amount for personal use or resale. The government also produced evidence of jailhouse admissions and an exhibit made by Johnson regarding his connection to Mitchell and the conspiracy to distribute heroin in Waterloo. The jury found Johnson guilty on all counts and he was later sentenced as described above.

## II.

A. Judgment of Acquittal and Sufficiency of the Evidence

Johnson contends that the district court erred in denying his motion for judgment of acquittal and motion for a new trial based upon insufficiency of the evidence. "We review *de novo* the denial of a motion for judgment of acquittal." United States v. Cook, 603 F.3d 434, 437 (8th Cir. 2010). "We view the evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict." United States v. Chase, 451 F.3d 474, 479 (8th Cir. 2006) (internal quotation marks omitted). "A conviction may be based on circumstantial as well as direct evidence." United States v. Erdman, 953 F.2d 387, 389 (8th Cir. 1992). "We will reverse only if no reasonable jury could have found the defendant guilty." Cook, 603 F.3d at 437.

"We review a denial of a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 for an abuse of discretion." United States v. Maybee, 687 F.3d 1026, 1032 (8th Cir. 2012). "When faced with a motion for a new trial, unlike a motion for judgment of acquittal, a district court is permitted to weigh the evidence and judge witness credibility for itself in determining if there may have been a miscarriage of justice such that a new trial is required." United States v. Samuels, 543 F.3d 1013, 1019 (8th Cir. 2008).

"To establish a conspiracy, the government must prove: (1) the existence of an agreement among two or more people to achieve an illegal purpose, (2) the defendant's knowledge of the agreement, and (3) that the defendant knowingly joined and participated in the agreement." United States v. Whirlwind Soldier, 499 F.3d 862, 869 (8th Cir. 2007). "In a drug conspiracy case . . . the government is not required to

present direct evidence of an explicit agreement; juries may rely upon circumstantial evidence to discern a tacit agreement or understanding between the co-conspirators." United States v. Hodge, 594 F.3d 614, 618 (8th Cir. 2010). Furthermore, "[a] conspirator . . . need not know all of the conspirators or be aware of all the details of the conspiracy, so long as the evidence is sufficient to show knowing contribution to the furtherance of the conspiracy." United States v. Lemm, 680 F.2d 1193, 1204 (8th Cir. 1982).

The indictment charged Johnson with conspiring with Appling, Mitchell, Arthur Scott, Thelma Moore, Windy Hayes, Arvester Edwards, and Edward Sapp, as well as other persons known and unknown to the grand jury, to distribute and possess with intent to distribute 1 kilogram or more of a mixture or substance containing a detectable amount of heroin. Viewing the evidence in the light most favorable to the government, there is sufficient evidence that Johnson conspired with Mitchell and others to distribute heroin in the Waterloo area. Johnson admitted to a fellow inmate that he was "dealing with" Mitchell, and admitted to another inmate that he and Mitchell "worked together" and "would help each other out. If [one] was out of . . . product, the other [one] would front him and give him some so he'd have more to sell and things of that nature[.]" Trial Tr. 363. Along with these admissions, Johnson drew a diagram of the alleged conspiracy while incarcerated and in that diagram drew a line between himself and Mitchell, writing the word "connection" above it. The diagram indicated also that Mitchell "sent people [to him] when he was out of heroin[.]" Alfred Scott corroborated these admissions by testifying that he had on at least two occasions attempted to purchase heroin from Mitchell, who instead directed him to Johnson.[2] This testimony was supported further by the testimony of Alfred's

_____

[2]To the extent that Johnson contends the district court erred in admitting Scott's testimony under the coconspirator exception to hearsay, Federal Rule of Evidence 801(d)(2)(E), we are satisfied that the district court did not clearly err in its application of the procedure established in United States v. Bell, 573 F.2d 1040 (8th Cir. 1978).

brother, Arthur Scott, who explained that the Waterloo heroin network was a cooperative rather than competitive market, wherein individual dealers sold heroin in amounts for personal use as well as in amounts for resale to other dealers, depending on who had heroin at the time and who did not.

In addition to this evidence, the government produced evidence of Johnson's dealings with unindicted coconspirators. VonVeta Sawyers, Cory Elfsrud, and Joey Butikofer each testified that they purchased heroin from Catherine at her house and in doing so were introduced to Johnson. Each testified further that after meeting Johnson through Catherine, he began purchasing drugs from Johnson as well. Terry Sallis and Simmons each testified that Virgil had steered him to Johnson to purchase heroin, and in Simmons's case, that Virgil was rewarded with free heroin from Johnson. Sawyers testified also that Johnson was directly involved with Catherine's heroin dealing. He testified that at times he would attempt to buy heroin from Catherine, but was told that she did not have heroin at that moment and that he would have to wait. Sawyers testified that he would wait on the porch of her house while Catherine, Johnson, and Johnson's uncle, Lusta, would have "meetings" in the house, after which Johnson would leave and Catherine would immediately emerge with heroin to sell. The inference being that Johnson fronted heroin to Catherine for resale.

Furthermore, the government produced evidence that after Appling's disappearance, Johnson began making trips to Chicago to purchase heroin more frequently and in larger quantities, the inference being that dealers such as Johnson were now responsible for supplying the Waterloo area as well. There was also evidence that on one occasion Johnson brought a young woman back from Chicago to sell heroin. Catherine then called various individuals to tell them about the presence of Johnson's source, including indicted coconspirator Moore, who testified that she visited Catherine's house and purchased heroin from this young woman.

---

See United States v. Moss, 138 F.3d 742, 744 (8th Cir. 1998).

This evidence is sufficient to support the finding that there was an agreement to distribute heroin in the Waterloo area, that Johnson was aware of this agreement, and that Johnson knowingly contributed to the furtherance of this agreement. Accordingly, the district court did not err in denying Johnson's motion for judgment of acquittal, nor did it abuse its discretion in denying his motion for a new trial.

B. Constructive Amendment and/or Variance

"A constructive amendment occurs when the essential elements of the offense as charged in the indictment are altered in such a manner—often through the evidence presented at trial or the jury instructions—that the jury is allowed to convict the defendant of an offense different from or in addition to the offenses charged in the indictment." Whirlwind Soldier, 499 F.3d at 870. "In reviewing an appeal based on a claim of constructive amendment, we consider whether the admission of evidence or the jury instructions created a 'substantial likelihood' that the defendant was convicted of an uncharged offense." Id. "A variance arises when the evidence presented proves facts that are 'materially different from those alleged in the indictment.'" United States v. Buchanan, 574 F.3d 554, 564 (8th Cir. 2009) (quoting United States v. Begnaud, 783 F.2d 144, 147 n.4 (8th Cir. 1986)). "The basic difference between a constructive amendment and a variance is this: a constructive amendment changes the charge, while the evidence remains the same; a variance changes the evidence, while the charge remains the same." United States v. Stuckey, 220 F.3d 976, 981 (8th Cir. 2000). "A variance is harmless error if it does not prejudice a defendant's right to notice, while a constructive amendment is reversible error per se." United States v. Farish, 535 F.3d 815, 822 (8th Cir. 2008).

Johnson first argues that the district court's failure to include the names of each of the named coconspirators in Instruction Nos. 13, 14, and 15 was a constructive amendment. Because the identity of a defendant's coconspirators is not an essential element of conspiracy, United States v. Oseby, 148 F.3d 1016, 1024 (8th Cir. 1998),

the district court's failure to include the names of the coconspirators in the jury instructions was not a constructive amendment of the indictment. See United States v. Jarrett, 684 F.3d 800, 802-03 (8th Cir. 2012) (concluding that no constructive amendment took place when the alteration in the jury instructions was not an alteration of the essential elements of the offense).

Johnson next argues that the government's presentation of evidence at trial regarding the individuals with whom he conspired created a constructive amendment. As discussed above, the government produced evidence that Johnson conspired with Mitchell and other individuals not named in the indictment, including Catherine, Lusta, and Virgil, to distribute heroin in Waterloo. Again, the identity of the coconspirators is not an essential element to a charge of conspiracy. Accordingly, the presentation of evidence that Johnson conspired with an indicted coconspirator as well as other unindicted coconspirators cannot be said to have altered an essential element, such that there is a "substantial likelihood" that the jury convicted him of an offense other than that charged in the indictment. See United States v. Alcorn, 638 F.3d 819, 822 (8th Cir. 2011) (noting that we have "rejected the notion that evidence and arguments about a date other than that listed in the indictment 'contributed to the existence of a variance or a constructive amendment' of the indictment,'" when "the date of possession is 'not a material element of the felon in possession of a firearm charge'" (quoting United States v. Howe, 538 F.3d 842, 851 n.4 (8th Cir. 2008), *abrogated on other grounds by* United States v. Villareal-Amarillas, 562 F.3d 892, 896 (8th Cir. 2009))).

Johnson contends that if evidence of the unindicted coconspirators did not create a constructive amendment, it constituted at the very least a variance. "A variance results where a single conspiracy is charged but the evidence at trial shows multiple conspiracies, but reversal is warranted only if the variance infringed a defendant's substantial rights." United States v. Ghant, 339 F.3d 660, 662 (8th Cir. 2003) (internal quotation marks and citation omitted). "A defendant's substantial

rights are infringed where: (1) the defendant could not reasonably have anticipated from the indictment the evidence to be presented against him; (2) the indictment is so vague that there is a possibility of subsequent prosecution for the same offense; or (3) the defendant was prejudiced by a 'spillover' of evidence from one conspiracy to another." United States v. Pizano, 421 F.3d 707, 720 (8th Cir. 2005) (internal quotation marks omitted).

Johnson contends that the government's evidence demonstrated the existence of two conspiracies, creating a variance from the single conspiracy alleged in the indictment. "A single conspiracy is composed of individuals sharing common purposes or objectives, operating under one overall agreement to commit an illegal act[.]" United States v. Chantharath, 705 F.3d 295, 301 (8th Cir. 2013) (internal quotation marks and citations omitted). "In determining whether a single or multiple conspiracy exists, we view the evidence in the light most favorable to the jury's verdict." United States v. Romero, 150 F.3d 821, 825 (8th Cir. 1998) (internal quotation marks and citation omitted). "Whether the government's proof at trial established only a single conspiracy or multiple conspiracies is determined by the totality of the circumstances, drawing all reasonable inferences in favor of the verdict." United States v. Espinoza, 684 F.3d 766, 776-77 (8th Cir. 2012). "Relevant factors include the nature of the activities involved, the location where the alleged events of the conspiracy took place, the identity of the conspirators involved, and the time frame in which the acts occurred." United States v. Radtke, 415 F.3d 826, 838-39 (8th Cir. 2005) (alteration and internal quotation marks omitted). "A single conspiracy may exist even if the participants and their activities change over time, and even if many participants are unaware of, or uninvolved in, some of the transactions." United States v. Roach, 164 F.3d 403, 412 (8th Cir. 1998). Moreover, that dealers may compete against one another does not preclude them from being part of the same conspiracy. See id.

In this case, the totality of the circumstances demonstrates that no variance existed between the facts alleged in the indictment and the evidence presented at trial. Contrary to Johnson's characterization of the evidence at trial, a reasonable jury could conclude that there was a single, albeit loose, conspiracy to distribute heroin in Waterloo, involving not only Johnson and the other coconspirators named in the indictment, but also Catherine, Lusta, and Virgil.

Moore, Scott, and Hayes, all of whom were named as coconspirators in the indictment, testified that they were directly involved in the trafficking of heroin with Catherine. Moore testified that she, Catherine, and Lusta sold heroin together. Scott testified that he knew Catherine, Lusta, and Virgil as heroin dealers and that he bought from and sold heroin to these individuals. As discussed above, there was testimony that Johnson had "meetings" with Catherine and Lusta regarding heroin dealing and that on occasion these meetings resulted in Johnson's fronting Catherine heroin for resale. Furthermore, there was testimony that several potential buyers were introduced to Johnson through Catherine and then began buying heroin from Johnson also. There was evidence that various participants in the conspiracy, named and unnamed in the indictment, acted as middlemen and "steerers" for various buyers and dealers in Waterloo. In addition to the testimony described above regarding Mitchell and Virgil steering potential buyers to Johnson, there was testimony from Hayes that she would often purchase heroin from Catherine as an intermediary for individuals. This cooperative atmosphere and frequent steering was supported by testimony from Arthur Scott that Waterloo's heroin network was cooperative, not competitive.

All of the actions discussed above took place in the Waterloo area during the time frame alleged in the indictment and involved the trafficking of heroin as alleged in the indictment. Moreover, although not all of the individuals discussed above were named in the indictment, their actions in supplying and aiding one another in the sale

-10-

of heroin demonstrates that they were aware of each other's actions and worked toward the common goal of distributing heroin in Waterloo. The application of the Radtke factors demonstrates that Johnson was a member of a single, loose conspiracy to distribute heroin in the Waterloo area. See Roach, 164 F.3d at 412 (jury verdict finding single conspiracy was supported by evidence that the individuals "provided one another ongoing aid in promoting the conspiracy" by facilitating sales to one another and supplying each other with resale quantities of drugs). "Because we find that no variance existed between the indictment and the government's proof, [Johnson's] argument that his substantial rights were violated is mooted." United States v. McGilberry, 620 F.3d 880, 886 (8th Cir. 2010).

C. Jury Instructions

Johnson next contends that the district court erred by refusing to give several requested jury instructions. "A defendant is entitled to a specific jury instruction 'that conveys the substance of his request if his request is timely, it is supported by evidence in the case, and is a correct statement of the law." United States v. Cruz-Zuniga, 571 F.3d 721, 725 (8th Cir. 2009) (quoting United States v. Whitehead, 176 F.3d 1030, 1037 (8th Cir. 1999)) (internal quotation marks omitted). "We review the district court's denial of a proposed jury instruction for abuse of discretion, reversing only if the district court's alleged erroneous failure to give a particular instruction was prejudicial." Espinoza, 684 F.3d at 783 (quoting Cruz-Zuniga, 571 F.3d at 725) (internal quotation marks omitted).

Johnson first argues that the district court abused its discretion by failing to give his requested single-versus-multiple conspiracy instruction. "If the evidence supports a single conspiracy, the failure to give a multiple conspiracy instruction is not reversible error." Roach, 164 F.3d at 412. "A multiple conspiracy instruction is not

-11-

required just because there are a number of sources and independent dealers if there was a shared objective to sell large quantities of drugs." Id. (internal quotation marks omitted). Because the evidence supports the finding of a single conspiracy, the district court's "failure to give a multiple conspiracy instruction is not reversible error." Id.

Johnson next contends that the district court abused its discretion by refusing to give his proposed instruction that a mere buyer-seller relationship is not sufficient to prove a conspiracy. We have held that such an instruction is not supported by the evidence and thus "not appropriate when there is evidence of multiple drug transactions, as opposed to a single, isolated sale." United States v. Hester, 140 F.3d 753, 757 (8th Cir. 1998) (quoting United States v. Wiggins, 104 F.3d 174, 177 (8th Cir. 1997)). The evidence described above of multiple transactions, at least one of which was in an amount for resale, does not support Johnson's proposed instruction, because no reasonable juror could conclude that Johnson was in a mere one-time buyer-seller relationship. See United States v. Ironi, 525 F.3d 683, 689 (8th Cir. 2008).

Johnson argues further that the district court abused its discretion by using the term "detectable" rather than "measurable" in Instruction No. 20, which instructed the jury that in determining whether Johnson was guilty of the offenses charged in counts 1, 11 and 14, which involved violations of 21 U.S.C. § 841, "the government need only prove beyond a reasonable doubt that there was a detectable amount of the controlled substance." Johnson argues that our prior case law, primarily United States v. Holland, 884 F.2d 354, 358 (8th Cir. 1989), and United States v. Biondich, 652 F.2d 743, 746 (8th Cir. 1981), requires proof of a "measurable" amount of a controlled substance to obtain a conviction under 21 U.S.C. § 841. Contrary to Johnson's characterization, the relevant language from Holland and Biondich states that any measurable amount of a prohibited substance will support a verdict of guilty for

possession of a controlled substance.  <u>See</u> <u>Holland</u>, 884 F.2d at 358; <u>Biondich</u>, 652 F.2d at 746.  These cases do not hold that such a conviction cannot also be sustained upon the presence of a detectable amount of a prohibited substance.  Importantly, both <u>Holland</u> and <u>Biondich</u> rely upon our decision in <u>United States v. Nelson</u>, 499 F.2d 965 (8th Cir. 1974) (per curiam), in reaching the conclusion that a measurable amount of a controlled substance will support a conviction.

In <u>Nelson</u>, the defendant was convicted after the jury was instructed that "any measurable amount of heroin would sustain the conviction."  499 F.2d at 966.  The evidence at trial demonstrated that while the substance possessed by the defendant qualitatively contained heroin, the chemical analysis did not establish the quantitative amount.  <u>Id.</u>  In affirming the conviction, the court rejected the proposition that the government was required to produce evidence of a quantitative amount of heroin to secure a conviction for possession of a controlled substance, and instead held that a chemical analysis demonstrating that the substance at issue qualitatively contained heroin was sufficient to support a defendant's conviction.  <u>Id.</u> at 966-67.  Thus, as used in <u>Nelson</u>, the term "measurable" carried a qualitative rather than quantitative meaning.

Johnson contends that he could have been acquitted of count 14 alleging possession with intent to distribute if the instruction had properly included "measurable," because the "jury could well have found that there was not a 'measurable' quantity of heroin (although there was a 'detectable' trace)[.]" Appellant's Br. 30.  Johnson's argument is the same as that rejected in <u>Nelson</u>.  As <u>Nelson</u> makes clear, to secure a conviction involving the possession of a controlled substance all that need be shown is a "qualitative analysis identifying the presence of heroin[.]"  499 F.2d at 967.  It is the necessity of qualitative rather than quantitative evidence that renders the district court's use of "detectable" instead of "measurable"

a distinction without a difference. Because both terms connote the qualitative presence of a substance, the district court did not abuse its discretion in refusing to give Johnson's proposed instruction. See United States v. McGeshick, 41 F.3d 419, 421 (9th Cir. 1994) ("[W]e can find no statutory requirement or policy reason for distinguishing between 'measurable' amount and 'detectable' amount. We hold that an instruction requiring proof that a detectable amount of the controlled substance was knowingly and intentionally distributed is sufficient to sustain a conviction under section 841(a).").

D. Sentencing

Johnson also challenges his sentence, contending that it is inconsistent with the district court's oral pronouncement of sentence. Specifically, Johnson contends that the district court orally pronounced that his sentences on counts 1, 11, 14, and 22, which includes a statutory mandatory term of life imprisonment under 21 U.S.C. § 841(b)(1)(A)(i) for his conviction under count 1, were to run concurrently with each other and consecutively to his sentence of 60 months' imprisonment on count 21.[3] The district court's written order, however, states that the sentence on count 21 is to be served consecutively to the terms imposed on counts 1, 11, 14, and 22. Johnson

_____

[3]Under 18 U.S.C. § 924(c)(1)(D)(ii), the term of imprisonment on count 21 is not permitted to be served "concurrently with any other term of imprisonment imposed on the person[.]"

-14-

contends that the written judgment must be corrected to reflect the oral pronouncement requiring that his sentence on count 21 be served first, with the sentences imposed on the remaining counts to follow thereafter.[4]

"The oral pronouncement by the sentencing court is the judgment of the court." United States v. Tramp, 30 F.3d 1035, 1037 (8th Cir. 1994). "Where an oral sentence and the written judgment conflict, the oral sentence controls." United States v. Foster, 514 F.3d 821, 825 (8th Cir. 2008) (quoting United States v. Glass, 720 F.2d 21, 22 n.2 (8th Cir. 1983)).  But, "[w]hen the oral pronouncement of sentence does not resolve whether a sentence runs consecutively or concurrently, the clearly expressed intent of the sentencing judge discerned from the entire record controls." Tramp, 30 F.3d at 1037 (quoting United States v. McAfee, 832 F.2d 944, 946 (5th Cir. 1987) (per curiam)).  Moreover, "written judgments and commitments may properly serve the function of resolving ambiguities in orally pronounced sentences." Aga v. United States, 312 F.2d 637, 641 (8th Cir. 1963) (quoting Payne v. Madigan, 274 F.2d 702, 705 (9th Cir. 1960)).

---

[4]This would become relevant if at a later time Congress were to reconsider and reduce the mandatory minimum sentence of life imprisonment for Johnson's conviction on count 1 and make such a reduction retroactive.

-15-

At the sentencing hearing, the district court first stated that Johnson is to "be imprisoned for a total term of life plus five years." Sent. Tr. 10. The district court, describing the composition of the total term, then stated that "the terms imposed on Counts 1, 11, 14, and 22 [are] to run concurrently with each other and consecutively to the term imposed on Count 21." Id. These two statements contradict one another, creating ambiguity in the district court's oral pronouncement of sentence. To remedy this ambiguity, we look to the entire record to discern the district court's true intent. The district court's written judgment states that Johnson's sentence is "60 months consecutive to Life." D. Ct. Judgment 3. The written judgment describes the sentence in greater detail, stating that "the terms imposed on Counts 1, 11, 14, and 22 [are] to run concurrently, and the term imposed on Count 21 [is] to run consecutively to the terms imposed on Counts 1, 11, 14, and 22." Id. Considering the written judgment in light of the ambiguity surrounding the oral pronouncement of sentence, we conclude that the district court's intent was that Johnson's sentence of 60 months' imprisonment on count 21 be served after and consecutive to his sentences on counts 1, 11, 14, and 22. See United States v. Buck, 661 F.3d 364, 374 (8th Cir. 2011). Accordingly, we reject Johnson's argument.

III.

The conviction and sentence are affirmed.

_____