# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-3299
_____

United States of America

*Plaintiff - Appellee*

v.

Dwight Rhodes

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis
_____

Submitted: April 9, 2013
Filed: September 13, 2013
[Published]
_____

Before LOKEN and GRUENDER, Circuit Judges, and PHILLIPS[*], District Judge.
_____

PER CURIAM.

A jury convicted Dwight Rhodes of using and maintaining a premises for the purpose of distributing and using a controlled substance in violation of 21 U.S.C.

_____

[*]The Honorable Mary Elizabeth Phillips, United States District Judge for the Western District of Missouri, sitting by designation.

§ 856(a)(1), and of three other drug and firearm offenses. He appeals, arguing only that the district court[1] erred in denying his motion for judgment of acquittal on the § 856(a)(1) count because the trial evidence was insufficient to prove that his purpose in using or maintaining the premises in question was to distribute a controlled substance.[2] Reviewing this issue with the deference that must be afforded the jury's verdict, we affirm. See United States v. Miller, 698 F.3d 699, 702 (8th Cir. 2012) (standard of review), cert. denied, 133 S. Ct. 1296 (2013).

## I.

The government's evidence at trial showed that, in the months leading up to Rhodes's arrest, drug task force officers and agents began investigating Rhodes and the residence located at 4535 Evans Avenue in St. Louis, based on citizen complaints and other sources. Conducting surveillance, Detectives Martin Garcia and Joseph Steiger saw Rhodes meet three or four individuals in front of 4535 Evans on one occasion. Another time, Rhodes's car was seen parked in front of the residence. The car was a 1977 Chevy with a black 8-ball well-known to pool players painted on the driver's side door. In drug parlance, an "eight ball" is one-eighth of an ounce of an illegal drug, a common wholesale quantity. Officer Lindsay Sudnig testified that during her patrols she often saw Rhodes and his car in the front yard of the residence. Based on the investigation, Detective Garcia obtained a search warrant for 4535

---

[1]The Honorable John A. Ross, United States District Judge for the Eastern District of Missouri.

[2]Neither counsel addresses how the § 856(a)(1) count impacted Rhodes's sentence, which was within the advisory guidelines range. The PSR grouped the count with a firearm offense that had a higher offense level. See U.S.S.G. § 3D1.3(a). Defense counsel argued to the district court that acquittal on this count "would also necessitate the dismissal of Count IV," a second firearm offense that carried a mandatory, consecutive 60-month sentence. But this was not argued on appeal.

Evans.  On October 6, 2011, as a SWAT team prepared to execute a high-risk warrant search, Detective Garcia and others once again conducted surveillance.

Before the warrant search, a white Pontiac Grand Prix arrived, Rhodes entered on the passenger side, and the Grand Prix drove off.  A mobile surveillance team including Detective Steiger followed.  When the Grand Prix drove in what appeared to be a common counter-surveillance pattern, a marked police car pulled it over at the team's request, and officers transported Rhodes back to 4535 Evans.  During transport, the officers smelled marijuana.  Rhodes admitted he had marijuana in his underwear. Upon arrival, a search of Rhodes's underwear uncovered a plastic bag containing six smaller baggies of marijuana but no paraphernalia for marijuana use.

Detective Garcia advised Rhodes of the warrant search and his <u>Miranda</u> rights.  Rhodes told the detectives he had  been living at 4535 Evans with his mother for several months and had a key to the back door. He said his room was on the second floor in the back of the house.  During the ensuing search, officers found:  (i) in the middle room, a gun holster on a coffee table and a box of documents bearing Rhodes's name and address under a couch cushion, including his car title and a receipt showing he paid over $600 to have the 8-ball painted on his car door; (ii) in the kitchen, furnished as a small living room, Rhodes's halfway house ID and a loaded .40 caliber pistol matching the holster under a couch cushion; (iii) in the second floor bedroom Rhodes identified as his, a pair of white tennis shoes holding a digital scale containing cocaine base residue, plastic baggies commonly used for drug distribution, a knotted plastic bag containing eight hydrocodone pills, and additional plastic baggies in a different shoe in the closet.  The officers found no paraphernalia for using any of the controlled substances found at the residence.  Rhodes told Detective Garcia that he slept on the couches, including the couch in the kitchen where the pistol was found.  He said his deceased brother (in fact, his cousin) owned the pistol.  Detective Garcia explained why he suspected the gun belonged to Rhodes.  He responded, "You're right, do what you have to do."  Detective Edward

Clay testified as a government expert regarding the distribution of illegal drugs and drug trafficking. After reviewing the evidence, Clay opined that the quantities and packaging of the drugs, the presence of multiple drugs, the absence of drug use paraphernalia, and the presence of a digital scale with drug residue and a .40 caliber pistol, all indicated drug distribution.

Rhodes's stepfather, Stanley Burgess, testified for the defense that he purchased 4535 Evans in 2008 and continues to repair it. While he occasionally passes through the residence, he and Rhodes's mother live several miles away, and he did not know whether Rhodes would spend the night there. On cross-examination, Burgess testified that neither he nor his wife kept a gun, a scale, or pills in a shoe at 4535 Evans. He conceded that the house serves no particular purpose for him while it is being repaired. Rhodes mother, Cheryl Rhodes, also testified for the defense. Contradicting Burgess, she testified they stayed at 4535 Evans three or four times each week. When Dwight Rhodes stayed there, he slept on the couch in the middle room where the box of his personal documents was found. However, she testified, he was not living at 4535 Evans. She confirmed that neither she nor Burgess owned a gun. She testified that the tennis shoes containing the digital scale, plastic baggies, and hydrocodone pills belonged to her deceased nephew, claiming that she put them in the second floor bedroom following the nephew's death but conceding the shoes did not then contain the scale, baggies, or pills. At the close of evidence, the district court denied Rhodes's renewed motion for a judgment of acquittal.

Section 856(a)(1) makes it unlawful to "knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance." Without objection by either party, and consistent with Eighth Circuit Model Criminal Jury Instruction 6.21.856A, the district court instructed the jury:

A defendant uses or maintains a place for the purpose of distributing a controlled substance if the defendant uses or maintains the place for the specific purpose of distributing the controlled substance. The specific purpose need not be the sole purpose for which the place is used, but must be one of the primary or principal uses to which the place is used.

On appeal, Rhodes argues the evidence was insufficient because it established that his primary purpose in using the premises at 4535 Evans was a residence, where he slept regularly, not for the purpose of distributing drugs. Reviewing the evidence relating to this issue under the instruction given, to which neither party objected, we disagree. See United States v. Ausler, 395 F.3d 918, 920 (8th Cir. 2005).

Even if the jury found Rhodes lived at 4535 Evans, he may be convicted of violating § 856(a)(1) if one of his primary uses of the residence was drug distribution. See United States v. Miller, 698 F.3d 699, 707 (8th Cir. 2012). Moreover, there was evidence that Rhodes did not live at 4535 Evans but merely slept there occasionally. And there was strong evidence that Rhodes regularly *used* the premises to store, weigh, and package a variety of illegal drugs which he then distributed in a car that prominently displayed a symbol advertising drug distribution. A digital scale with cocaine residue, hydrocodone pills packaged for sale, additional packaging materials, and a loaded pistol were all found in the room that Rhodes identified as his or under a cushion where he slept, strong circumstantial evidence that *he* used 4535 Evans for drug distribution. The testimony of Stanley Burgess suggested that the house had no other purpose during the time in question. As circumstantial evidence alone may support a conviction under § 856(a)(1), see United States v. Howell, 31 F.3d 740, 741 (8th Cir. 1994), this evidence was plainly sufficient to support the jury's verdict. Compare United States v. Wood, 57 F.3d 913, 919 (10th Cir. 1995); United States v. Smith, 359 Fed. App'x 124, 127 (11th Cir. 2010) (unpublished); United States v. Wadley, 185 Fed. App'x 137, 140, 142 (3d Cir. 2006) (unpublished).

Rhodes argues that the evidence was insufficient because there was no direct evidence that he sold drugs or that police ever observed a drug transaction at 4535 Evans. But "neither the sale of narcotics nor the possession of such are elements of the instant offense, so long as the premises were being maintained for one of the forbidden purposes . . . ." United States v. Snow, 462 F.3d 55, 71 (2d Cir. 2006), cert. denied, 549 U.S. 1150 (2007); see United States v. Verners, 53 F.3d 291, 294, 297 (10th Cir. 1995). "Accordingly, the district court did not err in denying [Rhodes's] motion for judgment of acquittal, nor did it abuse its discretion in denying his motion for a new trial." United States v. Johnson, 719 F.3d 660, 668 (8th Cir. 2013).

## II.

Following counsel's submission of the Brief of Defendant-Appellant, we denied Rhodes's *pro se* motion for leave to file a supplemental brief, as we customarily do when a party is represented by counsel. One month later, Rhodes filed a *pro se* Motion for Reconsideration of this order, arguing that Bailey v. United States, 133 S. Ct. 1031 (2013), decided after the filing of counsel's brief, established that the district court erred in denying Rhodes's motion to suppress. We grant the Motion for Reconsideration and reject this contention on the merits.

In Bailey, interpreting and applying Michigan v. Summers, 452 U.S. 692 (1981), the Supreme Court held that, once an individual has left the immediate vicinity of a premises that is being searched or is about to be searched pursuant to a search warrant, his involuntary detention must be justified by some rationale other than that it is incident to execution of the warrant. 133 S. Ct. at 1042-43. Here, Rhodes argues, the officers violated this principle when they detained him after stopping a car that departed from 4535 Evans and transported him back to the premises to be searched. We agree the rule in Bailey applies because it was decided while Rhodes's conviction was on direct appeal. However, we conclude that the district court's suppression order complied with this rule. The Magistrate Judge's

-6-

Report and Recommendation perfectly anticipated Bailey, noting that "Summers does not apply to this case because Rhodes was not on the premises when he was detained," but concluding that the detention was lawful because the officers had independent probable cause to detain Rhodes. We agree with this analysis. Because the issue has been considered and rejected on the merits in this direct appeal, it may not be raised in a motion for post-conviction relief under 28 U.S.C. § 2255 or § 2241.

The judgment of the district court is affirmed.

LOKEN, Circuit Judge, concurring.

I join the opinion of the court. I write separately to address an additional issue.

In arguing that Rhodes's conviction be affirmed, the government urged us to review the sufficiency of the evidence under a "significant purpose" standard allegedly articulated in United States v. Payton, 636 F.3d 1027, 1043 (8th Cir.), cert. denied 132 S. Ct. 349 (2011). In my view, the court properly declines this misguided invitation. In Payton, we *held* that the district court did not err in declining to give a requested instruction defining the statutory "purpose" element of the offense, explaining that the meaning of that term "lies within the common understanding of jurors and needs no further elaboration." Id. at 1042. In discussing the issue, we observed that § 856(a)(1) "does not require that drug distribution be the *primary* purpose, but only a significant purpose" (emphasis in original). Here, the district court did not instruct that drug distribution must be "*the primary* purpose," merely "*one of the primary or principal uses*." Looking at the question from a juror's perspective, I discern no meaningful difference between "a significant purpose" and "one of the primary or principal uses." Thus, there was no abuse of the district court's substantial discretion in formulating jury instructions.

In Payton and in Rhodes, two district courts took different approaches to this instruction issue after two different trials. One concluded the "purpose" element needed no special definition; the other thought the Model Instruction would be helpful to the jury. It does not confuse or corrupt this element of the statutory offense if we conclude that neither approach abused the district court's discretion to decide how to better assist the jury in a particular case. Rather, the government's argument reflects a failure to comprehend our abuse-of-discretion standard of review.

_____