No. 122,479

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

RANDALL LEE GILLILAND,
*Appellant*.

SYLLABUS BY THE COURT

1.

A traffic stop is not rendered invalid by the fact that it is a mere pretext for a narcotics search.

2.

If probable cause for an arrest is lacking, the court must exclude evidence found during a search incident to that arrest unless an exception to the exclusionary rule applies.

3.

The good-faith exception to the exclusionary rule applies when police act in "good faith" reliance on legal authority, such as warrants, statutes, or caselaw.

4.

*Herring*'s good-faith exception does not apply when the error was deliberate, reckless, grossly negligent, or related to recurring or systemic negligence so that exclusion of the illegally seized evidence can deter future culpable police conduct.

1

5.

 The mistake of fact exception typically applies when an officer makes a mistake affecting his or her belief.

6.

 The good-faith exception to the exclusionary rule ordinarily applies only when an officer relies in an objectively reasonable manner on a mistake made by someone else.

7.

 Suppression is not an automatic consequence of a Fourth Amendment violation. Instead, the question turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct.

8.

 The good-faith inquiry is confined to the objectively ascertainable question of whether a reasonably well-trained officer would have known that the search was illegal given all the circumstances.

9.

 The deterrent effect of suppression must be substantial and outweigh any harm to the justice system. Here, when a dispatcher's mistakes resulted from negligence rather than from systemic error or reckless disregard of constitutional requirements, the marginal benefits that might be gained from suppressing the evidence do not justify the substantial costs of exclusion.

Appeal from Atchison District Court; ROBERT J. BEDNAR, judge. Opinion filed May 14, 2021. Affirmed in part and dismissed in part.

*Allen A. Ternent*, of Ternent Law Office, of Atchison, for appellant.

*Sherri L. Becker*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., GARDNER and WARNER, JJ.

GARDNER, J.:  Randall Lee Gilliland appeals his convictions of possession of methamphetamine, possession of paraphernalia, and failure to use a turn signal. He claims that the officer lacked probable cause to arrest him, so the district court erred by denying his motion to suppress evidence found during his search incident to arrest. Gilliland also claims that the district court erred by requiring drug tests as a condition of his pretrial bond. Finding no error, we affirm in part and dismiss in part.

### FACTUAL AND PROCEDURAL BACKGROUND

In December 2018, two Atchison County Sheriff's Department officers saw Gilliland in the driver's seat of a parked vehicle. Recognizing Gilliland, the officers requested information on his driving status with the Joint Communication Dispatch Center for Atchison County. That center is a separate entity from the Atchison County Sheriff's Department and the City of Atchison Police Department. Officers gave dispatch Gilliland's name and a dispatcher responded that his license was expired in 2011 and revoked. The officers then stopped where they could see Gilliland, watched him drive away, and noticed that Gilliland failed to use his turn signal when he turned. The officers then stopped Gilliland for that traffic violation.

During the traffic stop, Gilliland told the officers that his driver's license was not revoked but was just restricted, and that the Kansas Division of Vehicles required him to

use an ignition interlock device when driving. He gave the officers a DC-36 form showing he was restricted from driving without an interlock device from July 1, 2015, to July 3, 2017, and he showed them his ignition interlock device. An officer then took Gilliland's license and asked dispatch to check his status again, giving dispatch Gilliland's license number as well as his name. Again, dispatch informed the officer that Gilliland's license was revoked and also expired in 2011.

Officers then ordered Gilliland out of his vehicle and arrested him. As officers searched Gilliland incident to his arrest, they found a small bag of methamphetamine, a pipe, and a straw with methamphetamine residue.

Officers later discovered that Gilliland's license at the time of his arrest was restricted rather than revoked. Only Gilliland's commercial driver's license (CDL) had been revoked.

After being charged, Gilliland moved to suppress the evidence officers found during their search. At the suppression hearing, the dispatcher admitted that she had made a mistake and that Gilliland's Class C driver's license was valid with restrictions on the date officers arrested him. She testified that errors do occur in the Kansas Division of Vehicles driver's license status system, but they are not common.

Gilliland argued that it was unreasonable for officers not to investigate further after he gave them good evidence contradicting the dispatcher's report that his license was revoked. Gilliland argued that it was unreasonable for officers to rely on the dispatcher's mistaken assertion when Gilliland had given them paperwork showing he could drive with a restricted license. He faulted officers for not telling the dispatcher about the form he had showed them stating his license was restricted and for not asking the dispatcher about the ignition interlock restriction. He also argued that the errors in the driver's license system could be evidence of systemic negligence.

4

The district court denied Gilliland's motion to suppress. It found that the dispatcher had made a mistake of fact, that the officer's reliance on the dispatcher's report was objectively reasonable, and that the good-faith exception to the exclusionary rule thus applied.

The parties then submitted the case for trial by the court based on stipulated facts. After the bench trial, the district court found Gilliland guilty of possession of methamphetamine, possession of drug paraphernalia, and failure to use a turn signal. The district court denied Gilliland's motion for a dispositional departure and sentenced him to 20 months' imprisonment.

Gilliland timely appeals. First, Gilliland argues that the officers made an improper pretextual stop and lacked probable cause to arrest him, so the district court should have suppressed the evidence found when officers illegally searched him. Secondly, Gilliland contends that the district court erred in imposing certain supervision conditions on his pretrial bond.

I.    DID THE DISTRICT COURT ERR IN NOT FINDING THE INITIAL STOP PRETEXTUAL?

We briefly address Gilliland's equally brief argument that the officers illegally stopped him based only on their belief that he possessed drugs. Gilliland argues that the officers' failure to ask dispatch about his paperwork and ignition interlock device shows the pretextual nature of their initial stop.

Yet Gilliland concedes that pretextual stops are legal when a legitimate reason for the stop exists. Our law has well established that proposition:  "A traffic violation provides an objectively valid reason to effectuate a traffic stop, even if the stop is pretextual." *State v. Anderson*, 281 Kan. 896, 901, 136 P.3d 406 (2006); see *Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996).

5

Officers testified that they stopped Gilliland because they saw him fail to use his turn signal when turning left in a four-way intersection, and because they believed his license was expired and revoked. The district court credited the officers' testimony. Failure to use a turn signal violates K.S.A. 8-1548. And observation of a traffic violation provides an officer with reasonable suspicion to conduct a traffic stop. See *State v. Kraemer*, 52 Kan. App. 2d 686, 692, 371 P.3d 954 (2016). So the officers' traffic stop here is not rendered invalid even if it were a mere pretext for a drug search. *State v. Jones*, 300 Kan. 630, 638, 333 P.3d 886 (2014) ("a traffic stop is not rendered invalid by the fact that it is 'a mere pretext for a narcotics search'").

## II. DID THE DISTRICT COURT ERR IN DENYING GILLILAND'S MOTION TO SUPPRESS?

We next address Gilliland's argument that officers lacked probable cause to arrest him, so the district court should have suppressed the evidence found when they illegally searched him.

### *Preservation*

Generally, to preserve a suppression of evidence argument for appeal under K.S.A. 60-404, the moving party must timely object at trial to admission of the evidence, specifying the ground for the objection. *State v. Alford*, 257 Kan. 830, 840, 896 P.2d 1059 (1995) (citing *State v. Toney*, 253 Kan. 651, 656, 862 P.2d 350 [1993]). But Kansas courts have allowed review of the issue on appeal even without a contemporaneous objection at times. See *State v. Kelly*, 295 Kan. 587, 594, 285 P.3d 1026 (2012). One such circumstance is when a defendant is tried solely on stipulated facts. In that situation, a defendant who fails to object to the admission of evidence at trial may still satisfy the requirements of K.S.A. 60-404 by filing a pretrial motion to suppress evidence. 295 Kan. at 594.

6

This exception applies here. The district court tried and convicted Gilliland based on stipulated facts. Gilliland did not object to the admission of the drugs or drug paraphernalia at trial, but he had filed a pretrial motion to suppress the evidence. And his trial stipulation shows that he intended to preserve this issue by filing the motion to suppress, even if he did not object at trial:

> "[T]he Parties request that the Court accept the instant matter for determination on the basis of designated record and accompanying stipulations of fact, that said record and stipulations be incorporated into and made a part of the trial record, and that Defendant's right to appeal any adverse ruling on his Motion to Suppress heard on August 19, 2019 be deemed preserved."

Gilliland has sufficiently preserved this issue for our review.

*Basic Legal Principles*

When, as here, the material facts to a district court's decision on a motion to suppress are not in dispute, the issue whether to suppress is a question of law over which this court has unlimited review. *State v. Martinez*, 296 Kan. 482, 485, 293 P.3d 718 (2013).

The State bears the burden of proving the lawfulness of a warrantless seizure. *State v. Morlock*, 289 Kan. 980, 985, 218 P.3d 801 (2009). Generally, a warrantless search by a police officer is per se unreasonable under the Fourth Amendment. *State v. Doelz*, 309 Kan. 133, 140, 432 P.3d 669 (2019). But exceptions to that rule exist, and one such exception is a search incident to lawful arrest. 309 Kan. at 140. The district court applied that exception here. Gilliland claims that was erroneous because his arrest lacked probable cause so was illegal and the search incident to lawful arrest exception cannot apply.

7

An officer must have probable cause to make an arrest. See *Bailey v. United States*, 568 U.S. 186, 192, 133 S. Ct. 1031, 185 L. Ed. 2d 19 (2013). Probable cause to arrest "exists where the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a [person] of reasonable caution in the belief that an offense has been or is being committed." *State v. Abbott*, 277 Kan. 161, Syl. ¶ 2, 83 P.3d 794 (2004). Law enforcement officers make probable cause determinations in the field by considering the totality of the circumstances, "including all of the information in the officer's possession, fair inferences therefrom, and any other relevant facts, even if they may not be admissible on the issue of guilt." 277 Kan. 161, Syl. ¶ 3.

If probable cause for an arrest is lacking, the court must exclude evidence found during a search incident to that arrest unless an exception to the exclusionary rule applies. See *State v. Powell*, 299 Kan. 690, 694-95, 325 P.3d 1162 (2014). The exception we address here is the good-faith exception, applicable when police act in "good faith" reliance on legal authority, such as warrants, statutes, or caselaw. *Herring v. United States*, 555 U.S. 135, 142, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009); *State v. Ellis*, 311 Kan. 925, 933-34, 469 P.3d 65 (2020). But that good-faith exception is not applied when the error was deliberate, reckless, grossly negligent, or related to recurring or systemic negligence so that exclusion of the illegally seized evidence can deter future culpable police conduct. *Herring*, 555 U.S. at 144.

*Mistake of Fact Cases Do Not Apply*

Here, the dispatcher made a mistake of fact and the officer relied on it. The dispatcher erroneously told the officer twice that Gilliland's driver's license was revoked. Yet in fact, only Gilliland's CDL was revoked. Although the correct information was in the system, the information was not shown on the dispatcher's computer screen in the usual format, so the dispatcher twice reported the information incorrectly to the officers.

8

The parties devote much of their briefs to discussing whether this was a mistake of fact that may serve as an exception to the exclusionary rule. See *City of Atwood v. Pianalto*, 301 Kan. 1008, 1013, 350 P.3d 1048 (2015) (considering whether an officer's mistake was one of law or fact and finding that an officer's objectively reasonable mistake of fact that leads to an individual's arrest does not automatically require suppression of evidence discovered as a result of the mistake).

The dispatcher testified that the screen she read to the officer displaying Gilliland's information was unusual in two respects. First, rather than saying "status: REG: valid Kansas," as most regular licenses do, it had a blank after "status: REG:" yet said "CDL: revoked." Second, the ignition interlock restriction was near the bottom of the screen where she did not see it, instead of near the top where it usually is.

> "Q. . . . Now you're looking at this, what in particular are you looking at?
>
> "A. I'm looking and—his name. . . . The status would say over here suspended, revoked and—but doesn't say—or valid. Doesn't say anything right there but his CDL shows revoked. And also when it expires. Oh, I also look to see if they have any history and if they have corrective lenses and restrictions. Like here it says 'ignition interlock required.' So I—you also have to tell them that, too.
>
> "Q. But in this case you simply said to Detective Johansen that he was revoked and expired?
>
> "A. Right.
>
> "Q. Okay. And was that an error?
>
> "A. Yes."
>
> . . . .
>
> "Q. Miss Davis, just so that I fully understand, I want you to please look at State's Exhibit No. 1 for me.
>
> "A. Yes, sir.
>
> "Q. Describe to me exactly where it is that you wouldn't expect to see the ignition interlock restriction?
>
> "A. Majority of the time it's—would be underneath either their name or there where it says 'sex male.'

9

"Q. Okay. So, in other words, right where it says—on State's Exhibit 1, where it says 'status colon R-E-G colon,' that's the line where you would normally expect to see it; is that correct? Or one above it?

"A. Yes.

"Q. Okay. In this case obviously it appears several lines further down; correct?

"A. Right, it's down on the bottom.

"Q. When you saw the status colon R-E-G colon with a blank after it, you were expecting to see something in that blank; correct?

"A. Right, I was expecting.

"Q. When you didn't see it, did it occur to you to look carefully at the rest to see if perhaps there was further information?

"A. Yes.

"Q. But you didn't see the restriction one ignition interlock required?

"A. No."

The dispatcher agreed the system contained accurate information on Gilliland's driver's licenses and she simply misread the entry because of how it had been formatted.

As *Atwood* reveals, we typically apply the mistake of fact exception *when an officer* makes a mistake affecting his or her belief. See *State v. Miller*, 49 Kan. App. 2d 491, 494-95, 308 P.3d 24 (2013). On the other hand, the good-faith exception to the exclusionary rule ordinarily applies only when an officer relies in an objectively reasonable manner on a mistake made by someone else. *State v. Oram*, 46 Kan. App. 2d 899, Syl. ¶ 10, 266 P.3d 1227 (2011). Rather than rely on the mistake-of-fact cases, the better approach here, because someone other than the officer made the mistake, is to determine whether to apply the good-faith exception to the exclusionary rule as established in *United States v. Leon,* 468 U.S. 897, 922-23, 926, 104 S. Ct. 3405, 82 L. Ed. 2d 677, *reh. denied* 468 U.S. 1250 (1984) (officer relied on facially valid warrant), and applied in *Herring*, 555 U.S. at 147-48 (officer relied on negligently maintained police records). We assume without deciding that the officers lacked probable cause and, thus, violated the Fourth Amendment in arresting Gilliland. On that assumption, we

decide the case on the same narrow grounds the district court did—the good-faith exception to the exclusionary rule.

*The* Herring *exception applies*

The United States Supreme Court has recognized some good-faith exceptions when an officer acted in objectively reasonable reliance on certain circumstances outside of the officer's control. See *Herring*, 555 U.S. at 145-46 (officer relied on negligently maintained police records); *Illinois v. Krull*, 480 U.S. 340, 349-50, 107 S. Ct. 1160, 94 L. Ed. 2d 364 (1987) (officer relied on statute later deemed unconstitutional); *Leon*, 468 U.S. at 922-23 (officer relied on facially valid warrant).

Our Kansas Supreme Court has recognized four major exceptions to the exclusionary doctrine.

> "The exclusionary doctrine has four major exceptions:  (1) when police acted in 'good faith' reliance on legal authority, such as warrants, statutes, or caselaw; (2) when subsequent information was gathered from a source independent of the poisoned tree; (3) when the information would have been inevitably discovered, regardless of the illegality; or (4) when there has been sufficient attenuation between the illegality and the discovery of the evidence such that the taint of the illegality has been dissipated. *Herring v. United States*, 555 U.S. 135, 142-44, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009) (good faith); *Murray v. United States*, 487 U.S. 533, 537, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988) (independent source); *Nix v. Williams*, 467 U.S. 431, 443-44, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984) (inevitable discovery); *Hudson v. Michigan*, 547 U.S. 586, 593, 126 S. Ct. 2159, 165 L. Ed. 2d 56 (2006) (attenuation doctrine)." *Ellis*, 311 Kan. at 933-34.

The Kansas Supreme Court has sometimes applied good-faith exceptions:  when the officer reasonably relied on a facially valid warrant later found to be unsupported by probable cause, *State v. Hoeck*, 284 Kan. 441, 463-64, 163 P.3d 252 (2007) (adopting and

11

applying *Leon*); and when an officer reasonably relied on a statute later declared unconstitutional, *State v. Daniel*, 291 Kan. 490, 492-93, 242 P.3d 1186 (2010) (adopting and applying *Krull*, 480 U.S. at 349-50). But it has not yet addressed an officer's reliance on negligently maintained police records—the *Herring* kind of negligence.

We recognize that in *Ellis*, the Kansas Supreme Court narrowly stated *Herring*'s good-faith exception as "when police acted in 'good faith' reliance on legal authority, such as warrants, statutes, or caselaw." 311 Kan. at 933. But as we explain below, our facts fall within *Herring*'s broader rationale and holding. And our Supreme Court has repeatedly stated that it considers itself bound by United States Supreme Court precedent. See *Daniel*, 291 Kan. at 498; *State v. Henning*, 289 Kan. 136, 145, 209 P.3d 711 (2009) ("We interpret Section 15 of the Kansas Constitution Bill of Rights to provide the same protection from searches and seizures as the Fourth Amendment to the federal Constitution. See *State v. Wood*, 190 Kan. 778, 788, 378 P.2d 536 [1963]. Thus, regardless of whether the statute is challenged under the federal or state Constitution, we consider ourselves bound by United States Supreme Court precedent."). So, we apply *Herring*'s good-faith analysis to the dispatcher's erroneous summary of the county's driving records.

In *Herring*, the United States Supreme Court examined "a negligent bookkeeping error by another police employee." 555 U.S. at 137. Law enforcement officers arrested a man after the dispatcher told officers he had an outstanding warrant in another county. Only after officers searched him incident to arrest did they learn that his warrant had been recalled five months earlier, yet no one had removed it from the computer database. The police had negligently made a recordkeeping error by failing to update the computer database to reflect the recall of the arrest warrant. The United States Supreme Court found the exclusionary rule did not require suppression of the drugs and firearm officers found in their search incident to arrest based on the warrant because the mistake was "the result of negligence . . . rather than systemic error or reckless disregard of constitutional

12

requirements." 555 U.S. at 147. "[T]he error was the result of isolated negligence attenuated from the arrest. We hold that in these circumstances the jury should not be barred from considering all the evidence." 555 U.S. at 137.

The exclusionary rule is a judicially created remedy that, to deter future violations, prohibits the use of evidence obtained in violation of the Fourth Amendment. *State v. Baker*, 306 Kan. 585, 590, 395 P.3d 422 (2017). But not all Fourth Amendment violations warrant the court's imposition of the exclusionary rule. "[S]uppression is not an automatic consequence of a Fourth Amendment violation. Instead, the question turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct." *Herring*, 555 U.S. at 137. To make this assessment, courts balance the deterrent effect against the societal harms that come from suppressing the evidence. 555 U.S. at 141.

> "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.
>
> . . . .
>
> "[W]e conclude that when police mistakes are the result of negligence such as that described here, rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not 'pay its way.'" *Herring*, 555 U.S. at 144, 147-48 (quoting *Leon*, 468 U.S. at 907-08 n.6).

Even before *Herring*, a panel of our court used a similar analysis, reaching the same result. In *State v. Mansaw*, 32 Kan. App. 2d 1011, 1015-18, 93 P.3d 737 (2004), *aff'd* 279 Kan. 309, 109 P.3d 1211 (2005), we upheld a search by officers incident to an arrest warrant later found to be invalid. Citing *Leon*, the panel concluded that "the good

faith exception to the exclusionary rule provides an additional basis for upholding the search of Mansaw's person after his arrest." 32 Kan. App. 2d at 1017-18.

More recently, in *State v. Wood*, No. 116,376, 2018 WL 3485788 (Kan. App. 2018) (unpublished opinion), a panel of our court applied *Herring* to a dispatcher error similar to the one made here. There, an Independence Police Department dispatcher erroneously told the officer that the defendant's driver's license was revoked, although only his CDL was revoked. The dispatcher misread the computer screen which indicated that Wood's CDL was revoked but his regular driver's license was valid. The panel found that the dispatcher's error that led to Wood's arrest resulted from an isolated human error, not from systemic error that could be attributed to an entire recordkeeping system:

> "[T]he evidence shows that the dispatcher's mistake of fact was not a case of deliberate, reckless, or grossly negligent conduct. Nor was there any showing that this erroneous report of Wood's driver's license status was part of recurring or systemic negligence by law enforcement, or a deliberate violation of Wood's Fourth Amendment rights. On the contrary, the dispatcher simply misread the computer screen which indicated that Wood's CDL license was revoked but his regular driver's license was valid. Moreover, Officer Townley had no reason to question or doubt the information from the dispatcher." 2018 WL 3485788, at *4.

It thus affirmed the denial of Wood's suppression motion. 2018 WL 3485788, at *4.

*The Officer's Acts Were Objectively Reasonable*

With those legal principles in mind, we turn to the facts here. Gilliland argues the presence of the ignition interlock device and the 2015 paperwork showing his driver's license was restricted, but not revoked, defeated the officer's probable cause that Gilliland was driving with a revoked license. Gilliland argues his conflicting information should have induced the officer to investigate more.

14

But the officer did double check the status of Gilliland's driver's license after seeing Gilliland's document. "[O]ur good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal" given "all of the circumstances." *Leon*, 468 U.S. at 922 n.23. "These circumstances frequently include a particular officer's knowledge and experience." *Herring*, 555 U.S. at 145. The officer testified that his training requires him to rely on the most reliable information available—the information available to the dispatcher through the State.

"Q. Is it common for people to show you documents from the Department of—of Motor Vehicles about the status of their license?

"A. Yes.

"Q. And what is the sheriff's department's policy when you're presented with this type of information?

"A. So we're trained to go off the—the most reliable information that's available which is the—the actual current status that dispatch is able to run through the State. So that's the information that we rely on, not pieces of paper that are—necessarily people have with them because if—I can explain that further if you'd like.

"Q. Yes. How—why wouldn't you just rely on what the driver is giving you?

"A. So when people receive different kinds of paperwork whether it be for—for warrants that are recalled or driver's license, their rights, there's things that can change that can't be changed on that piece of paper. Such as if Mr. Gilliland had been given a DUI since he had last been given that piece of paper, or if he was found to be driving without his interlock device before he got it installed, those would be reasons that the State would suspend or revoke his driver's license. So that's—looking at the piece of paper we don't know what has happened since, when he was given the piece of paper.

"Q. And so your training is to actually go by what dispatch is telling you?

"A. That's correct."

In his diligence, the officer requested Gilliland's driving status from the dispatcher a second time, after seeing Gilliland's conflicting information. Although the officer did

15

not specifically ask about the driving restrictions listed on the 2015 notice, his reliance on the dispatcher's repeated insistence that Gilliland's driving privileges were revoked was reasonable. Moreover, the dispatcher was not an employee of the sheriff's department, and the officer had no reason to know of any previous errors in the dispatch system.

Nor does Gilliland's assertion that his information was more recent than 2011 show the officer's reliance was unreasonable. Although the dispatcher said Gilliland's license was revoked in 2011, and Gilliland's document apparently showed his driver's license was restricted from 2015 to 2017, it is not unreasonable for the officer to believe the information dispatch provides is the most up-to-date information available, and thus the most accurate, as he testified. The officer followed his training by relying on dispatch for license information he could not otherwise access. So even though the officer saw Gilliland's papers showing that his driver's license may have been previously restricted, he had no reason to question the dispatcher's information that his license was currently revoked. The evidence fails to show that a reasonably well-trained officer would have known that the search was illegal given all the circumstances.

*The Dispatcher's Negligence Was Not Systemic*

Gilliland also argues that the potential for errors in the driver's license status program results from systemic negligence, thus the good-faith exception to the exclusionary rule does not apply. See *Herring*, 555 U.S. at 144. He relies on the fact that the dispatch system sometimes gives officers wrong information about driver's license status.

But we find no evidence that errors in the system Atchison uses are routine or widespread. To the contrary, the 21-year veteran dispatcher testified that errors do not happen very often.

16

"Q: . . . Had you experienced problems with the format before in terms of information that was lacking or blanks that were not filled in?

"A. Not for a long time, no.

"Q. Okay. When you say a long time, what's a long time to you?

"A. Five years.

"Q. Okay. Had you in the year prior to December of 2018 had other instances in which information was not reported on the Kansas Car Stop that should have been? In other words, blanks, like after the status regular entry?

"A. You mean like on other peoples['] driver's license?

"Q. Yeah, that was missing information?

"A. I imagine so but I don't—I can't remember the names or anything.

"Q. Oh, understood. Is that something that is fairly common?

"A. No, it's not fairly common.

"Q. Okay. How uncommon is it would you say? Or if—do you think it's uncommon or just doesn't happen very often?

"A. Doesn't happen very often."

Gilliland presents only one example of a one-time error. The record thus shows no evidence establishing that the error made here was systemic. Rather, the evidence shows that the dispatcher's negligence was isolated. Her mistake of fact was not deliberate, reckless, or grossly negligent conduct. Nothing shows that this erroneous report of Gilliland's driver's license status was part of recurring or systemic negligence by law enforcement, or a deliberate violation of Gilliland's Fourth Amendment rights. Rather, the dispatcher simply misread the computer screen which showed that Gilliland's CDL was revoked but his regular driver's license was restricted.

Under United States Supreme Court precedent that "the deterrent effect of suppression must be substantial and outweigh any harm to the justice system," when mistakes made by the adjuncts of police are the "result of negligence . . . rather than systemic error or reckless disregard of constitutional requirements," the marginal benefits that might be gained from suppressing the evidence obtained do not justify the substantial

17

costs of exclusion. *Herring*, 555 U.S. at 147. The abuses which gave rise to the exclusionary rule simply are not present here. See 555 U.S. at 143.

The good-faith exception to the exclusionary rule applies because the officers' conduct was not deliberate enough that exclusion can meaningfully deter it. Because the district court correctly found that the good-faith exception applies, we affirm its denial of Gilliland's motion to suppress.

### III. DID THE DISTRICT COURT ERR IN IMPOSING CERTAIN REQUIREMENTS AS A CONDITION OF PRETRIAL BOND?

Gilliland next argues that the district court lacked authority under K.S.A. 2020 Supp. 22-2802 to impose random drug testing requirements as a condition of his pretrial bond. He alleges that the imposition of this condition caused an illegal, warrantless search of his person, violating his constitutional rights. He also argues that drug testing is irrelevant to the purpose of bond conditions—to reasonably assure the appearance of the person for preliminary examination or trial. And, Gilliland contends, if a district court is concerned about drug use, the statute has a more specific provision allowing the court to order a drug or alcohol abuse evaluation, but even those orders do not allow the district court to require him to submit to random drug tests. Nor does the statute allow the district court to revoke a bond for a positive urinalysis.

The State responds that this pretrial bond issue is moot because Gilliland is no longer on pretrial bond supervision—he has been tried and found guilty and the court cannot order Gilliland back on pretrial bond supervision.

*Mootness*

We first address the State's assertion of mootness. Generally, Kansas appellate courts do not decide moot questions or render advisory opinions. *State v. Montgomery*, 295 Kan. 837, 840, 286 P.3d 866 (2012). Instead, the court should "'determine real controversies relative to the legal rights of persons and properties which are actually involved in the particular case properly brought before it and to adjudicate those rights in such manner that the determination will be operative, final, and conclusive.'" *Stano v. Pryor*, 52 Kan. App. 2d 679, 682-83, 372 P.3d 427 (2016) (quoting *State v. Hilton*, 295 Kan. 845, 849, 286 P.3d 871 [2012]).

We will dismiss an issue on appeal as moot only if it is "'clearly and convincingly shown the actual controversy has ended, the only judgment that could be entered would be ineffectual for any purpose, and it would not impact any of the parties' rights.'" *Montgomery*, 295 Kan. at 840-41. Thus, we must determine whether an "appellate judgment on the merits would have meaningful consequences for any purpose, including future implications." *State v. Roat*, 311 Kan. 581, 592-93, 466 P.3d 439 (2020).

Generally, the asserting party has the burden to make a prima facie showing of mootness. 311 Kan. at 593. The record shows that Gilliland is no longer on pretrial supervision and has been convicted after a trial. The State has thus met its burden to make a prima facie showing of mootness. So the burden shifts to the party opposing mootness to show that an exception applies or that a substantial interest will be impaired if the case is dismissed as moot. 311 Kan. at 593.

To meet this burden, Gilliland asserts that the "capable of repetition" and "public importance" exception to mootness applies. Because mootness is a court-made doctrine, it is amenable to exceptions. *Montgomery*, 295 Kan. at 841. And our courts commonly

19

apply an exception when an issue "'is capable of repetition and raises concerns of public importance.'" *State v. Kinder*, 307 Kan. 237, 244, 408 P.3d 114 (2018).

Gilliland contends that he could not have filed an interlocutory appeal from the bond condition because he had to await a final judgment before appealing. Gilliland is correct—a criminal defendant may not appeal a criminal case until the judgment is final. *State v. McGaugh*, 56 Kan. App. 2d 286, 289, 427 P.3d 978 (2018). "Judgment" for a criminal case requires conviction and sentencing. 56 Kan. App. 2d at 289. And by the time a judgment is entered, a defendant is no longer on pretrial bond. So this pretrial bond issue is capable of repetition, yet evading review.

But Gilliland cites no authority for his barebones assertion that this issue is of public importance, as is necessary to apply this exception. "Public importance means more than that certain members of the general public are interested in the decision of the appeal from motives of curiosity or because it may bear upon their individual rights or serve as a guide for their future conduct." *State v. Hayden*, 52 Kan. App. 2d 202, 206, 364 P.3d 962 (2015). Gilliland summarily asserts that a drug test bond condition punishes him for a crime for which he has yet to be convicted and for which he enjoys a presumption of innocence. Yet Gilliland admits he has chemical dependency issues. And Gilliland, when on pretrial bond, was charged with possession of methamphetamine and had a substantial criminal history showing substance abuse or addiction. Under these facts, we see no issue of public importance that would be resolved by our reaching the merits. Rather, Gilliland shows only an issue that may affect his individual rights. We thus decline to apply an exception to the mootness doctrine.

We affirm the district court's denial of Gilliland's motion to suppress, and we dismiss as moot Gilliland's challenge to the conditions of his pretrial bond.

Affirmed in part and dismissed in part.