IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-78
No. 27A21

Filed 17 June 2022

STATE OF NORTH CAROLINA

v.

MICHAEL DEVON TRIPP


Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 275 N.C. App. 907, 853 S.E.2d 848 (2020), reversing an order entered on 8 June 2018 and vacating in part and remanding a judgment entered on 2 July 2018, both by Judge Charles H. Henry in Superior Court, Craven County. On 10 August 2021, the Supreme Court allowed defendant's petition for discretionary review of additional issues. Heard in the Supreme Court on 15 February 2022.

*Joshua H. Stein, Attorney General, by Kristine M. Ricketts, Special Deputy Attorney General, for the State-appellee-appellant.*

*Paul E. Smith, for defendant-appellant-appellee.*

BERGER, Justice.

Following the trial court's denial of his motion to suppress, defendant pleaded guilty to various drug offenses including trafficking in heroin, possession with intent to sell or deliver fentanyl, and possession with intent to sell or deliver heroin. The Court of Appeals reversed the trial court's denial of defendant's motion to suppress.

Based upon a dissent in the Court of Appeals and the allowance of defendant's petition for discretionary review, there are two issues now before this Court: whether the trial court's findings of fact challenged by defendant are supported by competent evidence, and whether the seizure and subsequent search of defendant comports with the Fourth Amendment. For the reasons stated below, we reverse the decision of the Court of Appeals.

## I. Factual and Procedural Background

Investigator Jason Buck of the Craven County Sheriff's Office Narcotics Division was alerted to several overdose deaths which were linked to heroin reportedly sold by defendant. In response to the information he obtained, Investigator Buck arranged a controlled buy of heroin between a confidential informant and defendant on April 25, 2017. Audio and video surveillance of the controlled buy confirmed the sale of heroin by defendant to the confidential informant.

Investigator Buck obtained a search warrant for the location where the controlled buy had occurred, 8450 U.S. Highway 17 N., Vanceboro, North Carolina. The warrant authorized a search of the residence, carport, outside storage building, and three vehicles. Although defendant was identified in the search warrant, search of his person was neither requested in the application nor authorized in the warrant.

A law enforcement briefing was held before execution of the search warrant.

Attendees were briefed on the search warrant and the controlled buy that had occurred the previous day. Lieutenant John Raynor, who oversees the narcotics unit, attended the briefing to ensure adherence to the following policy during the execution of the search warrant:

> [A]ll persons on scene or in proximity to our scenes that we believe to be a threat are dealt with, which means that we will detain them briefly, pat them down for weapons, make sure they're not a threat to us and then one of the narcotics investigators on scene will make a determination if that person can leave or not.

Lieutenant Raynor explained in his testimony that individuals considered a threat included

> [a]nyone with a prior history with us, with violent history, known to carry guns, any known drug dealers that we have past history with. By nature, generally drug dealers are considered violent and by nature a majority carry guns in one nature or another, so everybody inside of a known narcotics residence or on the scene there we deal with for our safety purposes, then deem whether or not they're suspect at that point to continue further.

¶ 5          Deputy Josh Dowdy was present at the briefing and understood that defendant was the target of the operation and that officers were searching for heroin based on the controlled buy. Deputy Dowdy was familiar with defendant based on prior law enforcement-related encounters, including three incidents in which defendant had brandished or discharged firearms. All three incidents occurred in the same area along U.S. Highway 17 near the residence identified in the search warrant.

¶ 6        Nearly a dozen officers participated in the execution of the search warrant. Upon his arrival at the site, Deputy Dowdy observed defendant and other individuals on a wheelchair ramp on the neighboring property at 8448 U.S. Highway 17, which belonged to defendant's grandfather. Testimony at the suppression hearing estimated the distance between the two residences to be between fifty and sixty yards.

¶ 7        Deputy Dowdy approached defendant and instructed him to place his hands on the railing of the wheelchair ramp. Defendant was wearing baggy jogging pants which were loose enough to allow Deputy Dowdy to view the contents of defendant's pockets without manipulating his clothing. Deputy Dowdy observed money in defendant's left pocket and a plastic baggie in defendant's right pocket. Deputy Dowdy patted down the exterior of defendant's clothing and felt a large lump in defendant's right pocket. Based on his training and experience, after seeing the baggie and feeling the lump, in addition to the purpose for which law enforcement was at the scene, Deputy Dowdy believed the baggie contained narcotics. Deputy Dowdy removed the baggie from defendant's pocket and placed him in handcuffs. Testing later determined the contents of the baggie to be more than seven grams of a mixture of heroin and fentanyl.

¶ 8        Defendant moved to suppress the evidence recovered by Deputy Dowdy. In its written order denying defendant's motion to suppress, the trial court found the following:

1.     Investigator Jason Buck, a sworn law enforcement officer with the Craven County Sheriff's Office and a member of the Coastal Narcotics Enforcement Team, utilized a confidential informant which he found to be reliable to make a controlled purchase of heroin from the defendant, Michael Tripp, on April 25, 2017. The informant was equipped with video and audio equipment from which law enforcement could monitor the transaction. The defendant, who was known by law enforcement as a drug dealer in the Vanceboro area by reputation and criminal history, was identified by the informant and later verified by the recordings as the defendant and the seller of a quantity of heroin to the informant. The sale was made from within the defendant's residence . . . in Vanceboro, North Carolina.

2.     As a result of that investigation, Deputy Buck obtained on April 26, 2017 a search warrant for that residence and several motor vehicles associated with that address from Superior Court Judge Benjamin Alford.

3.     At approximately 6:00 p.m. on April 26, 2017 eleven officers with the Craven County Sheriff's Office and Coastal Narcotics Enforcement Team executed that search warrant for that residence.

4.     Prior to the execution of the search warrant an operation plan meeting was held by the officers conducting the operation. The plan was to clear the residence and detain all who were present. The residence to be searched was on a dirt road contiguous to homes resided in by other members of the defendant's family. The officers utilized four unmarked vehicles to get to that location. The officers had not obtained an arrest warrant for the defendant prior to the operation.

5.     Deputy Josh Dowdy, a nine year veteran of the sheriff's office and a trained member of the Coastal

Narcotics Enforcement Team, participated in the execution of the search warrant. Dowdy understood that the target of the search was the defendant. He knew the defendant from at least three other inter[actions] with the defendant. In 2011 and 2013 he had been called to the defendant's residence due to domestic disturbances in which the defendant had been brandishing a firearm. In 2012 he had arrested the defendant for an assault on a female. At the time of that arrest, he was at his grandfather's house which is located about 60 yards from the residence being searched pursuant to the April 26, 2017 search warrant.

6. The Craven County Sheriff's Office had a policy described by Lt. John Raynor that required that all people who are "on scene" or "in proximity to our scene" whom they believe to be a threat or had previously dealt with be detained and briefly patted down for weapons to make sure they are not a threat to any of the narcotics officers. The policy provided that anyone who had a prior violent history, [was] known to carry firearms, or sold narcotics were deemed to be threats.

7. When the narcotics officers arrived at [the residence] in Vanceboro, North Carolina, the defendant was outside at his grandfather's house within sixty yards of the residence to be searched and had a direct line of sight to it and the officers on scene.

8. As Deputy Dowdy was getting out of his motor vehicle he observed the defendant to his right near the front porch of the defendant's grandfather's house. Because of his past experiences with the defendant, his previous firearm possessions, and the reasons that brought law enforcement to this residence, Dowdy asked him to put his hands on the railing of a handicap ramp attached to his grandfather's house so he could "pat" him down for

weapons. It was the policy and normal procedure of the Sheriff's Office for the safety of the officers and those present to pat down all individuals with whom they made contact while executing a search warrant. The defendant complied.

9.     The defendant was wearing baggy jogging pants. While patting him down Dowdy could feel what he thought was money in his left pocket. Because his pants were so "baggy[,]"[ ] Dowdy could see, without manipulating the garment, a plastic baggie in his right pants pocket, and while patting him down he felt a large lump associated with that baggie. His training and experience allowed him to reasonably conclude that the plastic baggie in the defendant's pocket contained narcotics. As a result Dowdy removed the bag and its contents. Dowdy had concluded that the plastic baggie was consistent with how narcotics are carried and packaged. He was also acutely aware of the reasons that they were searching the defendant's residence.

10.    The baggie contained a white powdery substance which Dowdy concluded was a controlled substance. The defendant was handcuffed and detained and walked over to his residence. He would be later [ ] charged with multiple counts of trafficking in heroin and felonious possession of fentanyl and marijuana. The search of the defendant resulted in the seizure of 7.01 grams of schedule I heroin and the schedule II opiate, fentanyl. The search of [the] residence resulted in the seizure of drug paraphernalia and marijuana.

¶ 9     Based upon these findings of fact, the trial court made the following

conclusions of law:

1.     That there was probable cause on April 26, 2017 for the issuance of the search warrant for 8450 U.S.

Highway 17 in Vanceboro, N.C.

2.    Deputy Dowdy was unaware there existed probable cause to arrest the defendant without a warrant for the previous day's felonious sale of heroin to Deputy Jason Buck's confidential informant. N.C. Gen. Stat. §15A-401(b)(2)(a).

3.    Under the circumstances then existing, Deputy Dowdy conducted a limited "frisk" or search for weapons of the defendant which was reasonable and constitutional. *State v. Long*, 37 N.C[.] App. 662, 668-69, 246 S.E.2d 846, 851 (1978).

4.    Dowdy had reasonable suspicion and was justified from the totality of the circumstances and his previous experience with the defendant in believing that the defendant, who was the subject of multiple narcotics sale investigations, was armed and could pose a danger to those law enforcement officers who were conducting the search of the defendant's residence. *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).

5.    Because the defendant had made a sale of heroin to an undercover informant the previous day and was the occupant of the premises searched, it was likely he was going to be detained while the search was conducted. An officer executing a warrant directing a search of premises not open to the public may detain any person present for such time as is reasonably necessary to execute the warrant. If the warrant fails to produce the items named the officer may then search any person present at the time of the officer's entry to the extent reasonably necessary to find the property described in the warrant. N.C. Gen. Stat. §15A-256. The defendant, even if the narcotics had not been uncovered by Dowdy, would have faced such a search under that statute or pursuant to his arrest [for the] sale of heroin and for what was found in the residence. The search of the

residence did not apparently result in finding any appreciable amount of heroin.[1]

6. The bag containing heroin had been located in the defendant's baggy pants pocket which Deputy Dowdy could see into when he frisked the defendant. At that time Dowdy had legal justification to be at the place and in the position he was when he saw the baggie in plain view. Its discovery was inadvertent as it was discovered during the pat down. The baggie was immediately apparent to Dowdy to be evidence of a container for illegal narcotics and would warrant a man of reasonable caution in believing the defendant was in possession of drugs and was hiding evidence which would incriminate him. The plain view doctrine was applicable in this case and all the elements were present. *State v. Peck*, 305 N.C. 734, 743, 291 S.E. 2d 637, 642 (1982).

7. After Dowdy observed the baggie and had felt the pocket during his pat down for weapons, because of the totality of the circumstances known to him at the time, he had probable cause to seize the baggie and its contents and later place him under arrest.

¶ 10 Following the trial court's denial of defendant's motion to suppress, defendant pleaded guilty to various drug offenses including trafficking in heroin, possession with intent to sell or deliver fentanyl, and possession with intent to sell or deliver heroin. Defendant reserved his right to appeal the trial court's denial of his motion to suppress.

¶ 11 The majority in the Court of Appeals held that the trial court erred in denying

---

[1] The State did not argue to this Court that N.C.G.S. § 15A-256 applied.

defendant's motion to suppress and vacated the convictions. *State v. Tripp*, 275 N.C. App. 907, 924, 853 S.E.2d 848, 860 (2020). The dissent in the Court of Appeals argued that defendant's detention was justified under the United States Supreme Court's holdings in *Michigan v. Summers* and *United States v. Bailey*, and this Court's decision in *State v. Wilson*. *Id*. at 932–35, 853 S.E.2d at 865–66 (Stroud, J., concurring in part and dissenting in part). The State timely appealed to this Court based upon the dissent. In addition, this Court allowed defendant's petition for discretionary review to determine whether the trial court's findings of fact listed in its order denying the motion to suppress were supported by competent evidence.

## II.    Standard of Review

¶ 12        Appellate review of a trial court's denial of a motion to suppress "is strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). Findings of fact not challenged on appeal "are deemed to be supported by competent evidence and are binding on appeal." *State v. Biber*, 365 N.C. 162, 168, 712 S.E.2d 874, 878 (2011). Even when challenged, a trial court's findings of fact "are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting." *State v. Buchanan*, 353 N.C. 332, 336, 543 S.E.2d 823, 826 (2001) (quoting *State v.*

*Brewington*, 352 N.C. 489, 498, 532 S.E.2d 496, 501 (2000)).

¶ 13 "Conclusions of law are reviewed de novo and are subject to full review." *Biber*, 365 N.C. at 168, 712 SE.2d at 878. Moreover, "the trial court's ruling on a motion to suppress is afforded great deference upon appellate review as it has the duty to hear testimony and weigh the evidence." *State v. McClendon*, 130 N.C. App. 368, 377, 502 S.E.2d 902, 908 (1998), *aff'd*, 350 N.C. 630, 517 S.E.2d 128 (1999).

### III.     Analysis

**A. Whether competent evidence supports the trial court's findings of fact**

¶ 14 Defendant contends several of the trial court's findings of fact are not supported by competent evidence. Specifically, defendant challenges findings of fact numbers 1, 5, 7, 8, and 9.

### 1. *Finding of fact #1*

¶ 15 Defendant asserts that the trial court's characterization of the 8450 residence as "defendant's residence" is not supported by competent evidence. During the hearing on defendant's motion to suppress, Investigator Buck testified that law enforcement had received "several citizen complaints about activity coming out of" the 8450 residence, and that a bad mixture of heroin "was coming from that residence, from Michael Tripp." In addition, the State entered the search warrant application into evidence. The application indicated that law enforcement had received information that defendant resided at the 8450 address, and that the controlled buy

between defendant and the confidential informant took place in the 8450 residence. Thus, the trial court's finding that "[t]he sale was made from within the defendant's residence" was supported by competent evidence.

¶ 16     Defendant also contends that there is no competent evidence to support the trial court's finding that Deputy Dowdy was among the officers who knew defendant was "a drug dealer in the Vanceboro area by reputation and criminal history." To the contrary, Lt. Raynor testified that the officers, including Deputy Dowdy, were briefed about the sale to the confidential informant in the pre-search meeting, "and that that was the probable cause for the search warrant." Audio and video surveillance captured defendant selling drugs to the confidential informant. In addition, defendant had a July 2017 conviction for possession with intent to sell and deliver cocaine. By definition, someone who sells drugs illegally is a drug dealer. *See State v. Williams,* 127 N.C. App. 464, 469, 490 S.E.2d 583, 587 (1997) (characterization of a defendant as a "drug dealer" was a "reasonable inference" based on the defendant's convictions for possession of cocaine with intent to sell). Furthermore, the application for the search warrant stated defendant "is a known drug dealer in the Vanceboro area and has a criminal history dating back to 2009." Deputy Dowdy also testified that in two of his previous encounters with defendant, one involved "some narcotics," and another resulted in defendant's arrest for "assaulting a female and simple possession of marijuana." Thus, there is competent evidence in the record to support

the trial court's finding that defendant was a drug dealer.

### 2. *Finding of fact #5*

¶ 17    Defendant next challenges the trial court's finding of fact that Deputy Dowdy was a "member of the Coastal Narcotics Enforcement Team" (CNET), a multiagency task force developed to coordinate local law enforcement investigations. Deputy Dowdy testified that he was an investigator with the Craven County Sheriff's Office and the record shows he participated in the pre-execution briefing with members of CNET. Although Deputy Dowdy did not specifically testify that he was a member of CNET, there is competent evidence in the record to support the trial court's finding.

### 3. *Finding of fact #7*

¶ 18    Next, defendant argues that there is insufficient evidence to support the trial court's finding that defendant "had a direct line of sight to the residence to be searched and . . . the officers on scene." Testimony at the suppression hearing described the distance between the 8450 and 8448 residences as "not far at all," and Deputy Dowdy estimated the distance to be around fifty to sixty yards. Investigator Buck testified that he could see people at the 8448 residence from the 8450 residence before entering the residence to conduct the search, and that he observed Deputy Dowdy escorting defendant toward the 8450 residence from the 8448 residence after the search of the residence was completed.

¶ 19    While defendant submitted a photograph that showed certain bushes or trees

could have possibly obstructed the line of sight between the residences, this Court affords great deference to a trial court's determination on conflicting evidence when reviewing a motion to suppress. *See State v. Malone*, 373 N.C. 134, 145, 833 S.E.2d 779, 786 (2019) ("A trial court has the benefit of being able to assess the credibility of witnesses, weigh and resolve any conflicts in the evidence, and find the facts, all of which are owed great deference by this Court."). Accordingly, competent evidence in the record establishes that there was a direct line of sight from defendant's location to his residence.

### 4. *Finding of fact #8*

¶ 20 Defendant challenges the trial court's finding that Deputy Dowdy detained and searched defendant based on "his past experiences with the defendant, his previous firearm possessions, and the reasons that brought law enforcement to this residence." Defendant contests this finding "to the extent it is inconsistent with Deputy Dowdy's concession that he believed he was acting pursuant to the search warrant."

¶ 21 Deputy Dowdy testified that he initially approached defendant because "he was [the] target of the search warrant." Deputy Dowdy's prior encounters with defendant, which included incidents related to violence, firearms, and illicit drugs, led Deputy Dowdy to conduct the pat-down for weapons for officer safety. In addition, Deputy Dowdy testified that he was aware of the recent controlled buy and that law enforcement was present at the scene to search for evidence related to transporting

and distributing "Cocaine, Marijuana and other controlled dangerous substances."

¶ 22    Thus, there is competent evidence in the record to support the finding that Deputy Dowdy detained and searched defendant "[b]ecause of his past experiences with the defendant, his previous firearm possessions, and the reasons that brought law enforcement to this residence."

### 5. *Finding of fact #9*

¶ 23    Defendant challenges the finding that "Deputy Dowdy 'was also acutely aware of the reasons that they were searching the defendant's residence.' "  Defendant argues this finding is not supported by the record "to the extent it indicates Deputy Dowdy knew the details underlying the application for the search warrant." Lieutenant Raynor testified that Deputy Dowdy was present at the pre-execution briefing, that those in attendance were informed of the controlled buy, and that a search warrant had been issued.  Deputy Dowdy testified that he was present at the pre-execution briefing and had been called "to assist . . . with a search of [defendant's] residence."  This evidence supports the finding that Deputy Dowdy was aware of the reasons for which law enforcement was searching the defendant's residence.

¶ 24    Defendant also challenges this finding "[t]o the extent it does imply that [Deputy] Dowdy believed the baggie contained narcotics based solely on his visual observations."  Nonetheless, defendant admits in the following sentence that the record "demonstrates it was both the sight of the baggie and how the baggie felt

during the frisk that made Deputy Dowdy believe it contained narcotics." Thus, competent evidence supports a finding that after seeing and feeling the baggie, Deputy Dowdy, based on his training and experience, reasonably concluded the baggie contained narcotics.[2]

### *6. Conclusion*

¶ 25          Because the trial court's findings of fact are supported by competent evidence, "they are conclusively binding on appeal." *Cooke*, 306 N.C. at 134, 291 S.E.2d at 619. In addition, the unchallenged findings of fact "are deemed to be supported by competent evidence and are binding on appeal." *Biber*, 365 N.C. at 168, 712 S.E.2d at 878. Thus, we must now determine "whether those factual findings in turn support the judge's ultimate conclusions of law." *Cooke*, 306 N.C. at 134, 291 S.E.2d at 619.

### B. *Summers, Bailey,* and *Wilson*

¶ 26          The Fourth Amendment declares that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. With respect to the Fourth Amendment, "a warrant to search for contraband founded on probable cause

---

[2] Additionally, defendant argues that the trial court's conclusion of law that defendant was an occupant of the premises to be searched is a finding of fact not supported by the evidence. "Whether a statement is an ultimate fact or a conclusion of law depends upon whether it is reached by natural reasoning or by an application of fixed rules of law," and the designation of such by a trial court is not determinative. *Brown v. Charlotte Mecklenburg Bd. of Educ.*, 269 N.C. 667, 670, 153 S.E.2d 335, 338 (1967) (cleaned up). Here determination as to whether an individual is an occupant of the premises to be searched is a conclusion of law and is discussed in our analysis of *Summers, Winters,* and *Bailey* below.

implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan v. Summers,* 452 U.S. 692, 705, 101 S. Ct. 2587, 2595 (1981) (footnotes omitted).

The Supreme Court reinforced this notion in *Bailey v. United States*, stating that "[w]hen law enforcement officers execute a search warrant, safety considerations require that they secure the premises, which may include detaining current occupants." 568 U.S. 186, 195, 133 S. Ct. 1031, 1038 (2013). Officers executing a search warrant are permitted under the Fourth Amendment to "take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search." *United States v. Jennings*, 544 F.3d 815, 818 (7th Cir. 2008) (quoting *Los Angeles County, Cal. v. Rettele,* 550 U.S. 609, 614, 127 S. Ct. 1989, 1992 (2007) (per curiam)). Indeed, "officers have a legitimate interest in minimizing the risk of violence that may erupt when an occupant realizes that a search is underway." *Id.* (citing *Summers*, 452 U.S. at 702–03, 101 S. Ct. at 2594). In addition to officer safety, "facilitating the completion of the search[ ] and preventing flight" are legitimate concerns justifying detention of an occupant. *State v. Wilson*, 371 N.C. 920, 923, 821 S.E.2d 811, 814 (2018) (quoting *Bailey*, 568 U.S. at 194, 133 S. Ct. at 1038).

"An officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" *Muehler v. Mena,* 544 U.S. 93, 98, 125 S. Ct. 1465, 1470

(2005) (quoting *Summers*, 452 U.S. at 705 n.19, 101 S. Ct. at 2594 n.19). Even absent evidence of danger to law enforcement,

> the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.

*Summers*, 452 U.S. at 702–03, 101 S. Ct. at 2594 (footnote omitted).

¶ 29      In interpreting *Summers* and *Bailey*, this Court has opined that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain (1) the occupants, (2) who are within the immediate vicinity of the premises to be searched, and (3) who are present during the execution of a search warrant." *Wilson,* 371 N.C. at, 924, 821 S.E.2d at 815 (cleaned up). These three factors "correspond to the 'who,' 'where,' and 'when' of a lawful suspicionless seizure incident to the execution of a search warrant." *Id*. at 924, 821 S.E.2d at 815.

¶ 30      Only two of the *Wilson* factors are at issue in the present case: whether defendant was an occupant of the 8450 residence as defined by this Court's precedent in *Wilson* and whether defendant was within the immediate vicinity of the area to be searched.

¶ 31      Determining whether an individual is an occupant and whether that individual is within the immediate vicinity necessarily involves many of the same considerations. *See Bailey*, 568 U.S. at 203, 133 S. Ct. at 1043 (Scalia, J., concurring)

(Occupants are "persons within the immediate vicinity of the premises to be searched." (cleaned up)); *cited with approval in United States v. Freeman*, 964 F.3d 774, 780–81 (8th Cir. 2020), *cert. denied*, 141 S. Ct. 1252, 208 L. Ed. 2d 636 (2021).

¶ 32        This Court concluded in *Wilson* "that a person is an occupant for the purposes of the *Summers* rule if he 'poses a real threat to the safe and efficient execution of a search warrant.' " 371 N.C. at 925, 821 S.E.2d at 815 (quoting *Bailey*, 568 U.S. at 201, 133 S. Ct. at 1042).  Thus, although not an "occupant" in the ordinary sense of the word, an individual's "own actions [can] cause[ ] him to satisfy the first part, the 'who,' of the *Summers* rule."  *Id*. at 926, 821 S.E.2d at 816.

¶ 33        The Supreme Court announced the immediate vicinity rule in *Bailey*, stating that "[a] spatial constraint defined by the immediate vicinity of the premises to be searched is . . . required for detentions incident to the execution of a search warrant." 568 U.S. at 201, 133 S. Ct. at 1042.  But *Summers* is "not confine[d] . . . to the premises identified in the search warrant, but extends . . . to the immediate vicinity of those premises."  *Wilson*, 371 N.C. at 925, 821 S.E.2d at 815.  Because reasonable minds may disagree on where the immediate vicinity line may be drawn, the Supreme Court noted that:

> In closer cases courts can consider a number of factors to determine whether an occupant was detained within the immediate vicinity of the premises to be searched, including the lawful limits of the premises, whether the occupant was within the line of sight of his dwelling, the ease of reentry from the occupant's location, and other

relevant factors.

*Bailey*, 568 U.S. at 201, 133 S. Ct. at 1042. Thus, the spatial limitation for detention discussed in *Bailey* is not necessarily the boundary of the property to be searched, but rather, may extend beyond the lawful limits of the property. Ultimately, determining whether an occupant was within the vicinity is a question of reasonableness. *See id.* at 201, 133 S. Ct. at 1042; *see also Wilson*, 371 N.C. at 925, 821 S.E.2d at 815.

¶ 34        As the trial court found, "[i]t was the policy and normal procedure of the Sheriff's Office for the safety of the officers and those present to pat down all individuals with whom they made contact while executing a search warrant." This practice is consistent with the rationale in *Wilson* that "someone who is sufficiently close to the premises being searched *could* pose just as real a threat to officer safety and to the efficacy of the search as someone who is within the premises." *Wilson*, 371 N.C. at 925, 821 S.E.2d at 815. As noted in *Summers,* "no special danger to the police" is required, 452 U.S. at 702, 101 S. Ct. at 2594; yet here defendant was a known drug dealer with a history of gun violence who was "within sixty yards of the residence to be searched and had a direct line of sight to it and the officers on scene." Defendant was outside a relative's home with other individuals when officers arrived to search his residence. This situation could have escalated quickly absent the encounter by Deputy Dowdy. Based on the totality of the circumstances, defendant was an occupant within the immediate vicinity of the 8450 residence because defendant was

close enough to the search that he had access to the residence and could have posed a real threat to CNET officers and the efficacy of the search.

¶ 35    The risk of harm here was minimized by law enforcement's "unquestioned command of the situation." *Id.* at 702–03, 101 S. Ct. at 2594.[3]    Because law enforcement officers are not required to ignore obvious dangers—here a drug dealer with a history of gun violence—defendant was an occupant within the immediate vicinity of his residence "even though [he] was not within the lawful limits of" his residence. *See Freeman*, 964 F.3d at 781; *see also Wilson*, 371 N.C. at 924, 821 S.E.2d at 815.

¶ 36    "[W]e must determine separately whether the search of defendant's person was justified." *Wilson*, 371 N.C. at 926, 821 S.E.2d at 816.    In making such a determination, this Court has stated:

> In *Terry v. Ohio*, the Supreme Court determined that a brief stop and frisk did not violate a defendant's Fourth Amendment rights when a reasonably prudent man would have been warranted in believing the defendant was armed and thus presented a threat to the officer's safety while he was investigating his suspicious behavior. In other words, an officer may constitutionally conduct what has come to be called a *Terry* stop if that officer can reasonably conclude in light of his experience that criminal activity may be afoot. The reasonable suspicion standard is a less demanding standard than probable cause, and a

---

[3] We are ever mindful that "court[s] should not indulge in unrealistic second-guessing" of judgment calls made by law enforcement. *United States v. Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568, 1575 (1985).

considerably less demanding standard than preponderance
of the evidence.

*Id*. at 926, 821 S.E.2d at 816 (cleaned up).

¶ 37        An officer can subject a detainee to a limited frisk only when he acts upon " 'specific and articulable facts' " that led him to conclude that [the] defendant was, or was about to be, engaged in criminal activity and . . . was 'armed and presently dangerous.' " *State v. Butler*, 331 N.C. 227, 233, 415 S.E.2d 719, 722 (1992) (quoting *Terry v. Ohio*, 392 U.S. 1, 21, 24, 88 S. Ct. 1868, 1880, 1881 (1968)). Ultimately, "[i]n determining whether the *Terry* standard is met," to justify a frisk for weapons, this Court considers the law enforcement officer's actions "in light of the totality of the circumstances." *Id*. at 233, 415 S.E.2d at 722. When analyzing the totality of the circumstances in cases involving known criminals, the Supreme Court has instructed courts to consider all of the "various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers," that a "trained officer [uses to] draw[ ] inferences and make[ ] deductions." *United States v. Cortez*, 449 U.S. 411, 418, 101 S. Ct. 690, 695 (1981). In addition, officers may draw on their own experience and specialized training to make inferences from, and deductions about, the cumulative information available to them that might well elude an untrained person. *See United States v. Arvizu*, 534 U.S. 266, 276, 122 S. Ct. 744, 752 (2002).

¶ 38        Firearms are tools of the trade for individuals involved in the illegal

distribution of drugs.  *See State v. Blagg*, 377 N.C. 482, 858 S.E. 2d 268, 2021-NCSC-66, ¶ 26; *see also United States v. Ward*, 171 F.3d 188, 195 (4th Cir. 1999) ("Guns are tools of the drug trade and are commonly recognized articles of narcotics paraphernalia."); *United States v. Kennedy*, 32 F.3d 876, 882 (4th Cir. 1994) ("[T]he law has uniformly recognized that substantial dealers in narcotics possess firearms and that entrance into a situs of drug trafficking activity carries all too real dangers to law enforcement officers." (cleaned up)); *United States v. Caggiano*, 899 F.2d 99, 103 (1st Cir. 1990) ("It is now recognized by us and other circuits that firearms are one of the tools of the trade of drug dealers. Guns, like glassine bags, scales and cutting equipment[,] are an expected and usual accessory of the narcotics trade."), *abrogated on other grounds by Horton v California*, 496 U.S. 128, 110 S. Ct. 2301 (1990); *United States v. Trullo,* 809 F.2d 108, 113 (1st Cir.1987) ("[T]o substantial dealers in narcotics, firearms are as much tools of the trade as are most common recognized articles of drug paraphernalia." (cleaned up)); *Polk v. State*, 348 Ark. 446, 453, 73 S.W.3d 609, 614 (2002) (recognizing that "firearms are considered a tool of the narcotic's dealer's trade.").

¶ 39        As discussed above, defendant was a known drug dealer with a history of gun violence.  This information was known to Deputy Dowdy, who had been briefed on the purpose and justification for issuance of the warrant to search defendant's residence.  A magistrate had determined probable cause existed that drugs and

firearms were likely to be found in defendant's residence during the execution of the search warrant, and defendant was an occupant within the immediate vicinity of his residence at the time of the search. The trial court determined that Deputy Dowdy conducted the frisk "[b]ecause of his past experiences with the defendant, [defendant's] previous firearm possessions, and the reasons that brought law enforcement to this residence."

¶ 40        In viewing the totality of the circumstances, Deputy Dowdy relied on specific and articulable facts based on his training, experience, and available information to form the reasonable belief that defendant was armed. *See Butler*, 331 N.C. at 233–34, 415 S.E.2d at 722–23. Thus, Deputy Dowdy's limited frisk of defendant was lawful.

¶ 41        During the frisk for weapons, Deputy Dowdy observed a plastic baggie in defendant's pocket. Deputy Dowdy eventually seized the plastic baggie, which contained a white powdery substance. Subsequent testing revealed the substance was a mixture of heroin and fentanyl.

¶ 42        Our State has adopted the "plain-view" doctrine as an exception to the general prohibition against warrantless seizures:

> While the general rule is that warrantless seizures are unconstitutional, a warrantless seizure of an item may be justified as reasonable under the plain view doctrine, so long as three elements are met: First, "that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed"; second,

that the evidence's "incriminating character . . . [was] 'immediately apparent' "; and third, that the officer had "a lawful right of access to the object itself."

*State v. Grice*, 367 N.C. 753, 756–57, 767 S.E.2d 312, 316 (2015) (quoting *Horton v. California*, 496 U.S. 128, 136–37, 110 S. Ct. 2301, 2308 (1990)).

¶ 43    The Supreme Court later extended warrantless seizures of items to "cases in which an officer discovers contraband through the sense of touch during an otherwise lawful search." *Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S. Ct. 2130, 2137 (1993). The "plain-feel" doctrine states that

> [i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.

*Id.* at 375–76, 113 S. Ct. at 2137.

¶ 44    During the pat-down for weapons, Deputy Dowdy observed a plastic baggie in defendant's pocket and "felt a large lump associated with that baggie." Based on his training and experience and the search of defendant's residence for contraband, the trial court determined that Deputy Dowdy reasonably and immediately concluded that the plastic baggie in defendant's pocket contained narcotics. Thus, seizure of the plastic baggie was permitted, and the search of defendant was constitutional.

**IV. Conclusion**

For the foregoing reasons, competent evidence supports the trial court's findings of fact, which, in turn, support its conclusions of law that defendant was lawfully detained pursuant to *Summers* and *Wilson*. Furthermore, the frisk of defendant, which led to the discovery of the illegal contraband, was reasonable under the totality of the circumstances. We reverse the decision of the Court of Appeals and reinstate defendant's convictions for trafficking in heroin and possession with intent to sell or deliver fentanyl. Defendant's remaining convictions are not before this court on appeal, and those convictions remain undisturbed. This case is remanded to the Court of Appeals for further remand to the trial court for additional proceedings not inconsistent with this opinion, including correction of any clerical errors identified by the Court of Appeals that are consistent with this opinion.

REVERSED AND REMANDED.

Justice BARRINGER concurring in part and concurring in the result.

As the majority holds, competent evidence supports the trial court's findings of fact which, in turn, support its conclusion of law that Deputy Dowdy lawfully seized the evidence from defendant. However, as the majority acknowledges, Deputy Dowdy had reasonable suspicion under *Terry v. Ohio*, 392 U.S. 1 (1968), to search defendant, rendering the discovery of the evidence lawful. Therefore, I would not reach whether Deputy Dowdy lawfully detained defendant under *Michigan v. Summers*, 452 U.S. 692 (1981), and *Bailey v. United States*, 568 U.S. 186 (2013). Accordingly, I join the majority in full except for its analysis and application of *Summers* and *Bailey*.

Justice EARLS dissenting.

Michael Devon Tripp was standing on his grandfather's porch when a team of Craven County police officers executed a search of the neighboring property. By all accounts, Tripp did nothing to interfere with the search or threaten the officers who were carrying it out; as his arresting officer later testified, Tripp did not "take any action to raise any suspicion of criminal activity on his part." Nonetheless, an officer, who mistakenly believed that the search warrant targeted Tripp personally, detained Tripp, patted him down for weapons, found a bag containing narcotics in his pocket, and then handcuffed him and placed him under arrest. The question before us now is whether the officer's warrantless detention and search of Tripp violated the Fourth Amendment to the United States Constitution, which "protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures' by the government." *State v. Grady*, 372 N.C. 509, 510 (2019) (quoting U.S. Const. amend. IV).

The majority concludes that the officer's actions did not violate the Fourth Amendment. Admittedly, this is a close case. Tripp was located somewhat near to the property being searched and was believed to have been using that property to distribute narcotics. The officer who detained and searched Tripp had firsthand knowledge that Tripp had brandished and fired a weapon many years ago during an assault that occurred on the same street as the property being searched. Although

Tripp was not a target of the search warrant, his suspected criminal conduct was itself the catalyst for the search. Tripp was not an entirely disinterested bystander who just happened upon the scene. Given these individualized circumstances, it is at least plausible that detaining Tripp was an objectively reasonable action undertaken "to secure the premises and to ensure their own safety and the efficacy of the search," *Los Angeles County v. Rettele*, 550 U.S. 609, 614 (2007) (per curiam), or that both the detention and search could independently have been justified under *Terry v. Ohio*, 392 U.S. 1 (1968).

¶ 49        Nonetheless, ultimately I disagree with the majority's interpretation and application of the law governing warrantless detentions incident to searches carried out under authority of a valid warrant. In particular, the majority's articulation of the test required under controlling United States Supreme Court precedent compounds an analytical error this Court committed in *State v. Wilson*, 371 N.C. 920 (2018). Once again, this Court adopts an approach to warrantless detentions incident to searches that is "only tangentially related to the rationales underlying" *Michigan v. Summers*, 452 U.S. 692 (1981) and *Bailey v. United States*, 568 U.S. 186 (2013), and which "suffers from both overbreadth and vagueness." *Wilson*, 371 N.C. at 933 (Beasley, J., concurring in the result only). Functionally, this line of reasoning collapses *Summers* and *Bailey* into *Terry* and, in the process, elides a crucial analytical distinction that safeguards every individual's constitutional right to be free

from unreasonable intrusions. Accordingly, I respectfully dissent.

¶ 50          In general, the Fourth Amendment prohibits law enforcement officers from detaining individuals without a warrant or probable cause. *Summers*, 452 U.S. at 700 ("[T]he general rule [is] that every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause."). As with most rules, there are exceptions. One exception is that officers may stop and frisk an individual when the officer "is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others." *Terry*, 392 U.S. at 24. Another exception is that officers executing a search warrant at a premises are afforded "the limited authority to detain (1) the occupants, (2) who are within the immediate vicinity of the premises to be searched, and (3) who are present during the execution of a search warrant." *Wilson*, 371 N.C. at 924 (cleaned up) (footnotes omitted) (interpreting *Summers* and *Bailey*). These exceptions share a common thread: both were introduced to account for the real and perceived dangers law enforcement officers face when interacting with the public in the course of carrying out official duties. *See, e.g.*, *Terry*, 392 U.S. at 23 ("[I]t would be unreasonable to require that police officers take unnecessary risks in the performance of their duties."); *Summers*, 452 U.S. at 702–03 ("[T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or

destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." (footnotes omitted)).

¶ 51        Both of these exceptions might apply at the same time in a given set of circumstances. An officer might possess the authority to detain an individual under *Summers* because the individual is an "occupant" in "the immediate vicinity of the premises being searched" who is "present during the execution of a search warrant," and that officer might simultaneously possess the authority to stop and frisk that individual under *Terry* because the officer has a reasonable suspicion the individual is armed and dangerous. But while these exceptions emerge from the same set of considerations and may apply concurrently, they are analytically distinct. *Summers*, 452 U.S. at 700-01 (noting the Fourth Amendment exception for "momentary, on-the-street detention accompanied by a frisk for weapons involved in *Terry*" before explaining the separate exception applicable to detention incident to a search based upon "the character of the official intrusion and its justification"). An officer's authority to detain an individual based on a reasonable suspicion the individual is armed and dangerous is not spatially or temporally limited. Thus, for *Summers* and *Bailey* to have any substantive meaning, these cases must authorize the detention of an individual who is not reasonably suspected of being armed and dangerous— otherwise, *Summers* and *Bailey* are just another way of characterizing actions that

already justify a search under *Terry*.

¶ 52 The most straightforward way to give *Summers* and *Bailey* substance is to give the words the Supreme Court chose to describe the test it was announcing something approaching their ordinary meaning. In *Summers* the Supreme Court held that officers have a limited authority to detain "an *occupant* of premises being searched for contraband pursuant to a valid warrant." 452 U.S. at 702 (emphasis added). An occupant is "[s]omeone who has possessory rights in, or control over, certain property or premises." *Occupant*, Black's Law Dictionary (11th ed. 2019). This defines "who" is subject to a *Summers* detention. In *Bailey* the Supreme Court clarified that this authority only permits officers to detain an "occupant" who is encountered within "the immediate vicinity of the premises to be searched." 568 U.S. at 197. This defines "where" a *Summers* detention may be carried out. Finally, officers may detain an occupant in the immediate vicinity of a property "during the execution of a search warrant." *Id.* at 194. This defines "when" a *Summers* detention may occur. By contrast, under *Terry* the "who" is anyone an officer reasonably suspects to be armed and dangerous, anytime and anywhere that person is encountered.

¶ 53 It may be correct that, as the majority suggests, many individuals who are found within the immediate vicinity of a property while that property is being searched are occupants. If *Summers* and *Bailey* give law enforcement officers a "categorical authority to detain" in order to facilitate the safe execution of a search

warrant, *Bailey*, 568 U.S. at 197, then officers cannot be required to make real-time qualitative assessments of an individual's antecedent connection to a property before initiating a detention, *see id.* at 204–05 (Scalia, J., concurring) ("*Summers* embodies a categorical judgment that in one narrow circumstance—the presence of occupants during the execution of a search warrant—seizures are reasonable despite the absence of probable cause.") (emphasis omitted). But *Wilson* maintained the distinction between the "who" and "where" aspects of the *Summers* inquiry, as the Court of Appeals has previously noted. *See State v. Thompson*, 267 N.C. App. 101, 109 (2019) ("The . . . suggestion that a defendant's presence in the immediate vicinity of a searched premises should operate categorically to satisfy the first prong of the *Summers* rule would render entirely superfluous our Supreme Court's scrupulous effort in *Wilson* to define 'occupant' ...."). If *Summers* is a source of categorical authority distinct from *Terry*, then an officer's assessment of the danger posed by an individual is irrelevant. *See Bailey,* 568 U.S. at 204 (Scalia, J., concurring) (explaining that even if there is evidence that a defendant "pose[s] a risk of harm to the officers," that evidence is "irrelevant to whether *Summers* authorized the officers to seize [the defendant] without probable cause") (cleaned up). The meaning of the term "occupant" must be found somewhere other than in an assessment of the "threat" posed by that individual: occupant means "a resident of the searched premises or a person physically on the premises that are the subject of the search warrant at the

time the search is commenced." *Wilson*, 371 N.C. at 934 (Beasley, J., concurring in the result only).

¶ 54        Thus, the majority goes astray in attempting to answer the question of whether Tripp was an "occupant" within the "immediate vicinity" of the premises being searched by asking whether Tripp "pose[d] a real threat to the safe and efficient execution of a search warrant." To be fair to the majority, this Court went astray in the exact same manner in *Wilson* when we stated that "a person is an occupant for the purposes of the *Summers* rule if he 'poses a real threat to the safe and efficient execution of a search warrant.' " *Id.* at 925 (majority opinion) (quoting *Bailey*, 568 U.S. at 201). The problem for the majority today, as for the majority in *Wilson*, is that the quoted language from *Bailey* was explaining why the interests underpinning the *Summers* rule only permitted an "occupant" to be detained within the "immediate vicinity of the premises." *See Bailey*, 568 U.S. at 201 ("Limiting the rule in *Summers* to the area in which an occupant poses a real threat to the safe and efficient execution of a search warrant ensures that the scope of the detention incident to a search is confined to its underlying justification. Once an occupant is beyond the immediate vicinity of the premises to be searched, the search-related law enforcement interests are diminished and the intrusiveness of the detention is more severe."). A person is not an occupant of a property because that individual poses a threat to persons located there as that word is defined either by Supreme Court precedent or by

ordinary usage; rather, an occupant may be detained under *Summers* because individuals located at a premises being searched "pose[ ] a real threat to the safe and efficient execution of a search warrant." *Id.,* at 201. Nevertheless, the majority follows *Wilson* in choosing to apply *Summers* in a way that untethers the rule from *Bailey*'s spatial moorings.

¶ 55        The majority appears to recognize the awkwardness of its own attempt to redefine the term "occupant"—as the majority acknowledges, denoting someone to be an "occupant" of a property based upon the threat that person poses to people located on that property is inconsistent with "the ordinary sense of the word." The practical and conceptual problems with this approach were ably summarized in Justice Beasley's concurring opinion in *Wilson*:

> Given the Court's stated justifications for *Summers*'s categorical rule, the term "occupant" can most reasonably be interpreted as a resident of the searched premises or a person physically on the premises that are the subject of the search warrant at the time the search is commenced. A nonresident arriving on the scene after the search has commenced has no reason to flee upon the discovery of contraband, to attempt to dispose of evidence, to interfere with the search, or to harm law enforcement officers because, unlike a resident or a person found at the scene when the officers arrive to conduct the search, evidence of wrongdoing discovered on the premises could not reasonably be attributed to him. Furthermore, the presence of a nonresident could do little to facilitate the search—a nonresident would not be able to open locked doors or containers and would have no interest in avoiding "the use of force that is not only damaging to property but may also delay the completion of the [search]," as

contemplated by the Court in *Summers*. Moreover, the existence of a valid search warrant—the foundation on which *Summers*'s categorical rule is built—is premised on a judicial officer's determination that police have probable cause to believe that someone in the home is committing a crime. That finding of probable cause does not extend reasonably to a nonresident or a person who is not in the home during the search.

The majority's definition of "occupant" requires no connection whatsoever to the property that is the subject of a search warrant or the suspected criminal activity—only that the person detained "poses a real threat to the safe and efficient execution" of the warrant. It is not unusual for a crowd of curious onlookers to gather along a police perimeter. How an officer executing a search warrant might differentiate a person posing a real threat from a neighbor or an innocent bystander is unclear, as any person in the vicinity of a police search could potentially interfere with the search or harm officers. Moreover, if an officer were able to conclude that a person posed such a threat, invocation of *Summers*'s categorical rule would be unnecessary because, as was the case here, the detention and search of that person would be justified by *Terry*.

371 N.C. at 934–35 (Beasley, J., concurring in the result only) (cleaned up) (footnotes omitted). This case perfectly illustrates the analytical confusion Justice Beasley identified. According to the majority, the reason Tripp was an "occupant" of the 8450 residence even though he was located beyond its legal boundaries is because he posed an "obvious danger[ ]" to the officers as "a drug dealer *with a history of gun violence*." But an individual is not an occupant who can be detained in accord with *Summers* because he is within shooting range of a property; an individual that an officer

reasonably suspects is armed and dangerous can always be detained under *Terry*.[1]

¶ 56       As described above, the distinction between an officer's authority under *Summers* and that officer's authority under *Terry* might, in certain factual circumstances, not really matter. If the sole consequence of the majority's analysis was that individuals who could be detained under *Terry* can also be detained under *Summers*, nothing much would be lost besides analytical clarity. But conceptually, an interpretation of *Summers* that jettisons its spatial dimension would not necessarily only encompass individuals who could be detained and searched under *Terry* because they were reasonably suspected of being armed and dangerous. Rather, under this interpretation of *Summers,* the category of individuals who "pose[ ] a real threat to the safe and efficient execution of a search warrant," *Bailey,* 568 U.S. at 201, is capacious and susceptible to subjective expansion. Accordingly, the potential group of detainees would continue to include an individual who may use a weapon against officers, certainly, but it could also sweep in "any grass-mowing uncle, tree-

---

[1] The majority tries to justify this elision by invoking the statement in *Wilson* that a defendant's "own actions . . . [may] cause[ ] him to satisfy the first part, the 'who,' of the *Summers* rule." 371 N.C. at 926 (majority opinion). This observation is true enough, if a person's actions cause that person to be located in the immediate vicinity of a property being searched pursuant to a valid search warrant. Thus, in *Wilson* the majority concluded that the defendant by his own actions became an occupant within the meaning of *Summers* when he "approached the house being swept[ and] announced his intent to retrieve his moped from the premises." *Id.* at 925. But if a person's actions cause an officer to reasonably suspect that he or she is armed and dangerous, that person is only searchable pursuant to *Terry*, unless that person is also simultaneously an occupant in the immediate vicinity of the premises being searched.

trimming cousin, or next-door godson checking his mail, merely based upon his 'connection' to the premises and hapless presence in the immediate vicinity." *Thompson*, 267 N.C. App. at 110. These people might not place officers executing a search warrant in physical peril, but their presence could plausibly distract or annoy officers, who might then have grounds to detain them because they are perceived to be interfering with the execution of a search warrant. Interpreted in this manner, *Summers* becomes "a sweeping exception to the Fourth Amendment's proscription against unreasonable seizures" that vests officers with "tremendous" and unbounded discretion. *Id.*

¶ 57 Regardless, under the facts of this case, Tripp's seizure was not justified under *Summers*, even as interpreted by *Wilson*. As the Court of Appeals correctly reasoned, if (1) the "who" and "where" inquiries under *Summers* remain distinct under *Wilson*, and (2) whether someone is an "occupant" of a property depends upon the nature of the threat that individual presents to officers located on the property, then an "occupant" can only be someone who "posed a *real* threat to the safe and efficient execution of the officers' search, not [someone who] *could* have posed a threat." *State v. Tripp*, 275 N.C. App. 907, 918 (2020) (cleaned up). There is absolutely no evidence to support the conclusion that Tripp posed a *real* threat to the officers—indeed, Tripp's arresting officer testified that Tripp did not "take any action to raise any suspicion of criminal activity on his part." The majority appears to suggest that since

many courts, although notably not our Court, have labeled firearms one of the "tools of the trade" of drug dealers, therefore for Fourth Amendment purposes, it is fair to assume that any person suspected of dealing drugs is armed, is a threat to police officers, and may be searched at any time in any place. That may be the majority's policy preference, but it is not a correct statement of the law. Instead, "whether a person poses a 'threat' turns on the particular circumstances as well as the particular individual's conduct during the execution of the warrant." *Id.*,at 921 (citing *Thompson*, 267 N.C. App. at 110). Tripp did nothing to menace or threaten the officers who were executing the search warrant, nor did he in any way attempt to interfere with their actions. Accordingly, he was not an "occupant" within the meaning of *Summers* as that term was defined in *Wilson*.

¶ 58          For similar reasons, the majority is wrong to conclude that the search of Tripp's person could be justified under *Terry*, which also does not allow law enforcement officers to search any person suspected of dealing drugs at any time based upon the *general* insight that drug dealers sometimes utilize firearms when engaged in illegal activities. *Terry* requires "*specific* and *articulable* facts" that support an officer's conclusion that an individual "was, or was about to be, engaged in criminal activity and . . . was armed and presently dangerous." *State v. Butler*, 331 N.C. 227, 233 (1992) (cleaned up) (emphasis added). Given that Tripp did not "take any action to raise any suspicion of criminal activity on his part," it is difficult to discern what specific and

articulable basis exists for the conclusion that it was reasonable to believe Tripp "was, or was about to be, engaged in criminal activity and . . . was armed and presently dangerous."

¶ 59        Enforcing constitutional limitations on the government's authority to engage in warrantless searches and seizures is not, as the majority suggests, an exercise in "unrealistic second-guessing of judgment calls made by law enforcement." It is instead a necessary function for courts to perform in order to uphold the Fourth Amendment's "recognition of individual freedom," which is "the very essence of constitutional liberty." *Ker v. California.*, 374 U.S. 23, 32 (1963) (cleaned up). In fact, the majority's illogical distortion of applicable Fourth Amendment precedent is functionally a nullification of the exclusionary rule. In the majority's view, having found Mr. Tripp in illegal possession of narcotics, the State should be able to punish him. However, in this case the officer's actions in searching him cannot be authorized under the doctrines that give meaning to the Fourth Amendment's prohibition of unreasonable searches and seizures. Therefore, I respectfully dissent.

Justice HUDSON and Justice MORGAN join in this dissenting opinion.